Glenn **VICKERY** and Dianne
Richards, Petitioners,

v.

Helen Roberta **VICKERY**, Respondent.

No. 98–0059.

Supreme Court of Texas.

May 27, 1999.

Gerald P. DeNisco, Gregg S. Weinberg, Dianne Richards, Houston, Mack J. Travers, Sherrie Haussner Travers, Katy, Richard R. Orsinger, San Antonio, Pamela E. George, Burta Rhoads Raborn, Houston, for Petitioners.

Christa Brown, Austin, Richard R. Morrison, Kemah, Ronald D. Krist, Hugh M. Ray, Houston, for Respondent.

Justice HECHT, dissenting from the denial of the petition for review.

The lower courts in this case awarded mental anguish damages and punitive damages to one spouse for the other's fraud in the division of their marital estate, and awarded mental anguish damages against an attorney for breach of her fiduciary duty to her client. These awards are not permitted under two of this Court's opinions that have issued while this petition for review has been pending. In *Schlueter v. Schlueter*, the Court held that "a separate and independent tort action for actual fraud and accompanying exemplary damages against one's spouse do not exist in the context of a deprivation of community assets".[1] In *Douglas v. Delp*, we held that mental anguish damages cannot be recovered for legal malpractice if plaintiff's loss is entirely economic.[2] If the holdings of *Schlueter* and *Douglas* were applied to the same issues in this case, the petition for review would have to be granted, the court of appeals' judgment reversed, and the case remanded to the district court for further proceedings. But the Court simply refuses to follow *Schlueter* and *Douglas* in this case that has been pending while those cases were being decided. The Court would not tolerate a lower court's refusal to follow our decisions, nor should it,[3] yet the Court will not follow its own decisions in contemporaneous appeals involving the same issues. It is awfully hard to insist on others' adherence to the rule of law when one's own commitment to the rule is, shall we say, intermittent. I would grant the petition for review in this case because I cannot see that *Schlueter* and *Douglas* leave any principled alternative. Accordingly, I respectfully dissent.

Mrs. Schlueter complained in her divorce proceeding that her husband had diverted to his father $12,565 in cash and an emu business worth $10,000 to avoid having these assets included in the couple's $122,600 community estate to be divided by the court.[4] Based on the jury's findings that Mr. Schlueter had defrauded the community estate and conspired with his father to harm Mrs. Schlueter, the district court rendered judgment that the community recover $12,850 from Mr. Schlueter and his father, jointly and severally, and that Mrs. Schlueter recover $30,000 in punitive damages and $18,500 in attorney fees from her husband, and $15,000 punitive damages from his father.[5] The court of appeals affirmed.[6] This

1. 975 S.W.2d 584, 589 (Tex.1998).

2. 987 S.W.2d 879, 884 (Tex.1999).

3. *See In re Smith Barney, Inc.*, 975 S.W.2d 593, 598 (Tex.1998) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)).

4. *Schlueter*, 975 S.W.2d at 586; *id.* at 591 (Hecht, J., dissenting).

5. *Id.* at 586.

6. *Schlueter v. Schlueter*, 929 S.W.2d 94 (Tex. App.—Austin 1996), *rev'd*, 975 S.W.2d 584 (Tex.1998).

Court reversed, holding that one spouse's fraud on the community estate could justify an unequal division of the estate but that "there is no independent tort cause of action for wrongful disposition by a spouse of community assets".[7] The Court added:

> while we hold that a separate and independent tort action for actual fraud and accompanying exemplary damages against one's spouse do not exist in the context of a deprivation of community assets, if the wronged spouse can prove the heightened culpability of actual fraud, the trial court may consider it in the property division.[8]

The petition for review in the present case was filed almost four months before *Schlueter* was decided, and the Court was well aware of the similarity of the issues in the two cases.[9] I specifically mentioned this case in my dissent to show that *Schlueter* was "not an isolated case." [10] The circumstances of this case, as depicted in the evidence supporting the jury's verdict, present an even stronger argument for recovery that those in *Schlueter*. Mr. Vickery, an attorney, misrepresented to his wife that they needed to divorce to protect their community estate from liability to a former client suing him for malpractice. When Mrs. Vickery balked, her husband enlisted a friend from law school days, Dianne Richards, to initiate divorce proceedings on behalf of Mrs. Vickery but without her consent. Richards also filed an answer and cross-petition for Mr. Vickery. A few weeks later the plaintiff in the malpractice case offered to settle with Mr. Vickery within the limits of his insurance coverage, but he did not disclose that offer to his wife. Instead, he insisted on proceeding with the divorce on the pretext of protecting the community estate and preserving his relationship with Mrs. Vickery

and their nine-year-old daughter. Reluctantly acquiescing, Mrs. Vickery agreed to a divorce decree that gave her $1.1 million (about 7.5%) of the $14.6 million community estate. The balance of the estate was either given to Mr. Vickery or left undivided (the decree is vague). The couple's principal residence, a ranch where Mrs. Vickery and her daughter were living, was Mr. Vickery's separate property, although the community had a reimbursement claim that was not addressed in the decree. The decree thus did little to accomplish Mr. Vickery's stated purpose in the divorce, to remove community property from the reach of a potential judgment creditor, although Mrs. Vickery may not have realized this at the time. Within six months, Mr. Vickery demanded that Mrs. Vickery agree to a nunc pro tunc decree that included a metes and bounds property description for the residence omitted from the original decree. Mrs. Vickery acceded. The next day Mr. Vickery retained a lawyer to have his former wife evicted from the residence. Shortly after Mrs. Vickery was served with process, Mr. Vickery married one of her best friends.

Realizing at last the depth of her former husband's deception, Mrs. Vickery attempted to negotiate a redivision of their community estate, but without success. Mrs. Vickery then filed the present action for a bill of review setting aside the divorce decree, a different division of the community estate, and actual and punitive damages from Mr. Vickery and attorney Richards. The jury found Mr. Vickery liable for fraud and breach of fiduciary duty and assessed Mrs. Vickery's damages at $6.7 million for loss of marital property and $1.3 million mental anguish, plus $1 million punitive damages. The jury also found that Richards' breach of fiduciary duty caused Mrs. Vickery a $100,000 loss

7.  975 S.W.2d at 589.

8.  *Id.* at 589–590.

9.  *See id.* at 591–592 (Hecht, J., dissenting).

10.  *Id.* at 591.

of marital property and $350,000 in mental anguish damages. The district court rendered judgment: setting aside the prior divorce decree as having been obtained through fraud extrinsic to the proceeding; dividing the $14.6 million community estate $8.5 million (58%) to Mrs. Vickery and $6.1 million (42%) to Mr. Vickery; awarding Mrs. Vickery $1.3 million mental anguish damages, $1.5 million prejudgment interest, and $1 million punitive damages against Mr. Vickery; and awarding Mrs. Vickery $350,000 in unspecified damages against Richards. Mrs. Vickery elected to receive the larger share of the estate awarded by the court rather than the $6.7 million for loss of marital property found by the jury.

The court of appeals affirmed in an unpublished opinion, a copy of which is attached as Appendix I. Justice Andell dissented from the denial of rehearing en banc, explaining that he would have held that while Mr. Vickery's conduct should have been considered in dividing the community estate, Mrs. Vickery had no independent tort action against her former husband and thus was not entitled to actual or punitive damages or prejudgment interest. Justice Andell would have remanded the case to the district court to reconsider the community division.

After this Court's decision in *Schlueter* issued, Mrs. Vickery attempted to distinguish that case from hers, arguing that *Schlueter* involved "mere 'fraud on the community'" while the present case involves "actual and intentional fraud." The argument cannot survive even a cursory reading of *Schlueter*. Mrs. Schlueter vigorously contended that "allowing a separate tort cause of action for actual fraud is necessary so that exemplary damages may be awarded for the intentional acts of the

wrongdoer spouse." [11] The Court expressly rejected this contention. Mrs. Vickery argues that her former husband's fraud is "particularly repugnant" because he "not only defrauded his spouse but he also tried to hoodwink the courts." The evidence favorable to the verdict indicates that Mrs. Vickery is correct, but Mr. Schlueter's fraud also involved both his spouse and the divorce court. Mrs. Vickery argues that her former husband did not merely deplete community assets, as Mr. Schlueter did by the transfers to his father, but directed his deception at her personally. I cannot see how Mr. Schlueter's deception was any less personal or actionable because he involved his father than was Mr. Vickery's.

Having dissented in *Schlueter*, I am not anxious to see its holding extended, but Mrs. Vickery has not distinguished *Schlueter*, and I think she cannot do so. In my dissent in *Schlueter* I argued that the present case, then pending, presented compelling reasons to allow one spouse to recover against another for fraud.[12] The Court was unmoved. While I remain in doubt that *Schlueter* was correctly decided, there is no doubt that it is the law. The Court cannot simply pick and choose the cases in which the rule it has announced will apply.

Applying *Schlueter* would require that the actual and punitive damages awarded Mrs. Vickery against her former husband be reversed and the case remanded to the district court to reconsider what division of the community is just and right. The district court may consider Mr. Vickery's "dishonesty of purpose or intent to deceive" and "the heightened culpability of actual fraud"[13] as found by the jury. As I understand *Schlueter*, the court may not simply divide the community estate to award Mrs. Vickery damages she cannot

---

11. *Schlueter*, 975 S.W.2d at 589.

12. *Schlueter*, 975 S.W.2d at 591–592 (Hecht, J., dissenting).

13. 975 S.W.2d at 589–590.

otherwise recover, but it also need not measure her share by the damages she has suffered. The court must consider all relevant factors in dividing the community.

The Court's recent decision in *Douglas v. Delp* requires that Mrs. Vickery's award of mental anguish damages against attorney Richards be reversed. In *Douglas* we held that a plaintiff cannot recover mental anguish damages resulting from economic loss due to legal malpractice.[14] The mental anguish Mrs. Vickery suffered as a result of attorney Richards' breach of fiduciary duty was entirely attributable to the economic loss of a proper share of the community. *Douglas* left open the recovery of mental anguish damages "when additional or other kinds of loss are claimed or when heightened culpability is alleged",[15] but this case does not fall into either category. Mrs. Vickery's only claim of loss was an economic interest in the community; custody of her daughter, for example, was not threatened by Richards' conduct. Nor did Mrs. Vickery seek a finding that Richards acted maliciously or a finding of punitive damages against Richards. In this way, Mrs. Vickery's claim against Richards is no different than the ordinary malpractice claim brought by Mrs. Delp in *Douglas*.

If the present case were pending in the court of appeals, the court would follow *Schlueter* and *Douglas*, the actual damages awarded Mrs. Vickery would be reversed, and the case would be remanded for the district court to reconsider a just and right division of the community. The result should be no different merely because the case is pending in a Court empowered—and regrettably, willing—to ignore its own decisions.

14. *Douglas*, 987 S.W.2d at 884.

## APPENDIX I

In The
Court of Appeals
For The
First District of Texas
NO. 01–94–01004–CV

GLENN VICKERY AND DIANNE RICHARDS, Appellants

V.

HELEN VICKERY, Appellee

On Appeal from the 311th District Court
Harris County, Texas
Trial Court Cause No. 91–42667

OPINION ON MOTION
FOR REHEARING

TIM TAFT, Justice.

On this day, the Court considered appellants' and appellee's motions for rehearing. We grant appellee's motion, deny appellants' motions, withdraw our opinion of December 5, 1996, and issue this opinion in its stead.

Appellants Glenn Vickery (Glenn) and Dianne Richards (Richards) (collectively, the defendants) appeal a jury verdict in favor of appellee Helen Vickery (Helen), Glenn's ex-wife. Helen filed a bill of review action to set aside the property division in the underlying divorce; she also sued Glenn and Richards, the attorney who represented her in the divorce, for various tort causes of action. Helen claimed that Glenn, a lawyer, fraudulently tricked her into getting an uncontested divorce on the pretext that they would reunite after the threat of a potentially costly malpractice suit had passed, and that Richards breached her fiduciary duty to Helen when she represented Helen in the divorce.

We affirm.

15. *Id.* at 885.

## Uncontroverted Facts

Helen and Glenn were married in 1978. Their daughter Jessica was born in 1982. Glenn, a personal injury lawyer, practiced in Baytown, Texas. Helen worked in his office as a legal assistant. The family lived at "Moss Hill," a ranch in Liberty County that Glenn had purchased before his marriage to Helen. The Vickerys also owned a house in West University Place.

In 1991, a former client, June Wright, sued Glenn for malpractice. Glenn had $5 million in malpractice insurance coverage, but Wright sought more than that amount.

In the spring of 1991, Glenn began discussing divorce with Helen. Glenn contacted Dianne Richards, a divorce lawyer, in August 1991, and told her to file, in Richards' words, a "plain vanilla" divorce petition on Helen's behalf. Richards was an old friend of Glenn and had gone to law school with him. On August 13, 1991, Richards filed a petition for divorce in Helen's name without ever speaking to Helen about the matter. Although Glenn represented himself pro se in the divorce, Richards prepared Glenn's original answer and counterclaim, someone in her office signed the pleading in Glenn's name, and Richards' office filed the answer and counterclaim on September 20, 1991.

On November 15, 1991, Helen signed the divorce decree. On November 22, 1991, Richards and Glenn appeared before Judge Bill Elliott, who signed the final decree of divorce.

Moss Hill had been awarded to Glenn in the divorce decree. In May 1992, Richards called Helen to tell her that the metes and bounds description of the Moss Hill property had been omitted from the divorce decree. Helen signed an agreed nunc pro tunc final decree of divorce that included this description. Judge Elliott signed the nunc pro tunc decree on May 12.

The next day, Glenn hired attorney Burta Raborn. A week after the trial court signed the nunc pro tunc decree, Raborn filed on Glenn's behalf a motion for enforcement that stated that Helen had refused to vacate Moss Hill, asked that she be held in contempt, and asked that a date be set for Helen to vacate the Moss Hill property. Helen was served with the motion for enforcement on June 2, but no hearing was set at that time.

Helen retained attorney Robert Newey to negotiate with Glenn and fully settle all matters connected to the divorce. On June 18, 1992, both Glenn and Helen signed a handwritten document that divided previously undivided assets. The document included a provision that it did not apply to undisclosed assets. This document was not filed with the trial court.

On June 20, 1992, Glenn married Lucille Powell, a woman who had been, at one time, Helen's best friend.

In June, Helen and Glenn, through their attorneys, continued to negotiate regarding the division of property. Fearing a disproportionate division of undivided assets, Glenn did not want the final order to include language regarding undisclosed assets. On July 2, Helen withdrew from settlement negotiations and later filed this lawsuit.

In July, Glenn advanced his motion to enforce the divorce decree. After a hearing on August 5, the trial court ordered Helen to vacate Moss Hill by August 31.

Helen pled the following causes of action against Glenn and Richards: fraud, conspiracy, breach of fiduciary duty. Additionally, she sued Glenn for duress and intentional infliction of emotional distress, and sued Richards for negligence, gross negligence, and violation of the DTPA. She also sought a post-divorce division of property. Alternatively, she sought a bill of review to set aside that portion of the divorce decree that divided the community estate. In his answer, Glenn raised the affirmative defenses of accord and satisfaction, novation, estoppel, waiver, laches, and counterclaimed for breach of contract.

The case went to the jury on the issues of breach of fiduciary duty (against Glenn and Richards) and fraud (against Glenn).

The jury found that: Glenn breached his fiduciary duty to Helen with respect to the division of marital property; Richards breached her fiduciary duty to Helen with respect to the divorce and division of marital property; Glenn committed fraud against Helen with respect to the division of marital property; and the division of the marital property was the result of extrinsic fraud on Glenn's part, unmixed with any negligence on the part of Helen. The jury awarded Helen $100,000 for loss of marital property and $350,000 for mental anguish from Richards, and $6,700,000 for loss of marital property and $1,300,000 for mental anguish from Glenn. Additionally, the jury awarded Helen $1,000,000 in exemplary damages from Glenn.

The trial court granted the bill of review and divided the marital estate. It rendered judgment against Glenn for $1,300,-000 in mental anguish damages, $1,000,000 in exemplary damages, and $1,521,371.39 in prejudgment interest on the $6,700,000 damages awarded for loss of marital property, for a total of $3,821,371.39. The trial court rendered judgment against Richards for $350,000.

### 1. Summary of Helen's Version of the Facts

Helen testified that in about June 1991, Glenn suggested that a divorce was necessary to protect their assets from potential creditors and assured her they would reunite after the threat of the Wright malpractice case had passed. She was shocked by his proposal and said that she wanted to keep the family together. Over the weeks, Glenn kept insisting on the necessity of the divorce. He told her the divorce would be kept secret to avoid embarrassment to the family.

Glenn told Helen he would get an attorney for her and hired Richards. Glenn had Helen open a bank account in Houston and gave her money to deposit in the new account. He then had her write a check to Richards for $1,630. Richards never spoke to Helen about filing the divorce petition. Helen did not know until Glenn told her that Richards filed a divorce petition in her name. Neither Glenn nor Richards told Helen that Glenn filed a counterclaim.

On October 28, Glenn again discussed the divorce with Helen, but this time also indicated that he was not happy in the marriage. Helen begged Glenn to keep the family together and proposed counseling. She began to see a therapist. Glenn also met with the doctor.

On November 15, Glenn asked Helen to meet him in Houston to look at some houses in West University. After they had looked at several houses, he pulled out the divorce decree and asked her to sign it. Helen began to cry. She reiterated that she did not want the divorce and begged him to keep the family together. Glenn drove around for two hours, telling her to trust him and pressuring her to sign the decree. She finally signed the papers without reading them.

As she drove back to Liberty, her mobile phone rang. It was Dianne Richards, calling at Glenn's behest. This was the first time Richards had spoken to Helen about the divorce. Richards identified herself and said, "This is unethical; I have never spoken with you." Helen, crying, told Richards she did not want the divorce. Richards replied, "Helen, you have done the right thing. You know you need to protect your assets.... Glenn loves you and Jesse very much. This divorce is only to protect your assets."

Helen did not learn that the trial court signed the divorce decree until Glenn told her. Glenn still maintained that they would reunite after the malpractice threat had passed. Unbeknownst to Helen, however, June Wright had made an offer to settle within Glenn's malpractice insurance limits on October 10, more than a month

before Glenn had Helen sign the divorce decree.

Even after the trial court signed the divorce decree on November 22, Glenn told Helen that they would reunite. Helen testified that until she was served with the motion to enforce the divorce decree, she believed they would get back together.

### 2. Summary of Glenn's Version of the Facts

Glenn was hospitalized during the trial and did not testify live. A videotaped portion of one of his depositions was played to the jury. Glenn stated that he never sought the divorce to protect assets and never mentioned this to Richards as a reason for the divorce. He wanted a divorce because the marriage had deteriorated. Helen chose Richards as her attorney, knew the divorce petition had been filed, read the divorce decree before signing it, and was aware that the divorce petition was going to be presented to the trial court. With respect to their assets, the divorce decree was deliberately kept vague, not to stymie creditors, but for safety reasons; he did not want knowledge of the family's holdings to "get out and be on the street."

### 3. Summary of Richards's Version of the Facts

Richards testified that Glenn asked her to represent Helen in the divorce, and that she filed the petition without first speaking to Helen or obtaining her consent because she knew Helen well enough to do so. Richards had spoken to Helen by telephone frequently over the years when Richards called Glenn's law office and had met her in person on several occasions. Richards prepared an answer and counter-petition for Glenn, someone in her office signed it for Glenn, and Richards' office filed it. Richards never told Helen that Glenn filed a counterclaim.

Glenn told Richards that he wanted the divorce to protect the marital estate's assets because of the pending malpractice suit. He never gave her another reason for the divorce. The description of assets in the divorce decree was therefore kept vague so that creditors would have difficulty tracing the assets.

Richards stated that she spoke to Helen several times about the pending divorce, and Helen never told Richards she did not want the divorce.

### Points of Error Common to Glenn and Richards

### 1. Motion to Recuse

In Glenn's point of error one and Richards' point of error 10, the defendants assert Judge Leonard Hoffman erred in denying their motion to recuse Judge Bill Elliott. In their motion, they alleged that Judge Elliott's partiality was reasonably in question because of his relationship with Roy Mease, one of Helen's attorneys.

At the hearing, Mease testified that he and Judge Elliott had known each other since 1965 and had been friends since 1983. The Mease and Elliott families had travelled together; in July 1991, the two couples went to Europe together. Mease had received a number of ad litem appointments from Judge Elliott, as well as from other judges. The largest ad litem fee he had ever earned was from a case to which he had been appointed by Judge Elliott, a divorce case styled *Platt v. Platt*. It is the *Platt* case that provides the basis for the defendants' complaints about the relationship between Mease and Judge Elliott.

Judge Elliott appointed Mease to represent the Platt children. Debra Jo Catlett represented Mr. Platt. Ed Wheeler represented Mrs. Platt. (Wheeler had been Mease's campaign manager in Mease's unsuccessful bid to become a district court judge.) A jury awarded custody of the Platt children to Mr. Platt. Judge Elliott granted Mrs. Platt's motion for new trial.

Mr. Platt was again awarded custody after the second trial.

Catlett testified at the recusal hearing that, during the first trial, she, Mease, and Wheeler agreed to the amount of attorney's fees each would receive—Mease would get $18,000, Catlett would get $12,500, and Wheeler would get $7,000. The lawyers did not, however, agree who would pay those fees. Catlett stated Mease told her that if Mr. Platt did not pay his fee, he would have Judge Elliott render the ad litem fees against Mr. Platt; Mease further threatened that if Platt did not pay, Mease would join the motion for new trial filed by Wheeler and

> the motion for new trial would be granted, ... he would get temporary orders entered where Mr. Platt would be ordered to deposit the $18,000 into the Court or pay him directly, he would ask for an additional $10,000 for temporary fees for the next trial, he would have the children removed from the custody of Mr. Platt, ... and he would make sure that Mr. Platt's child support increased.

Judge Elliott ordered Mr. Platt to pay Mease's and Wheeler's fees.[1] Catlett wrote Mease a check for $18,000 on behalf of Mr. Platt on July 8. About 10 days later, the Meases and the Elliotts took their trip to Europe.

According to Catlett, Judge Elliott later granted the motion for new trial filed by Wheeler on behalf of Mrs. Platt.[2] Mease told Catlett Judge Elliott granted the motion because Catlett had not paid Wheeler.

After Judge Elliott granted the motion for new trial, Catlett asked Judge Elliott to order Mease to return the $18,000. Judge Elliott refused. On behalf of Platt,

Catlett filed a suit against Mease for conversion of the $18,000. Shortly after she served Mease with interrogatories, Judge Elliott recused himself *sua sponte* from *Platt.*

In their motion for recusal, the defendants implied a connection between the $18,000 check Catlett gave to Mease on July 8, and the tour of Europe taken by the Meases and Elliotts a fortnight later. In their motion they asserted:

> While ordinarily a judge and an attorney travelling together in Europe, standing alone, would not be improper, in this instance where such travel followed immediately upon the heels of such attorney cashing an $18,000 check which had been ordered by the court and then proceeding on such travel raises an appearance of impropriety.

On appeal, defendants assert that in *Platt,* Mease used his friendship with Judge Elliott to his advantage. They also note that "once the fee to Mease was questioned, Judge Elliott saw fit to recuse himself from the Platt matter.... If it was appropriate for Judge Elliott to recuse himself in the Platt matter, it was likewise appropriate, if not mandated, in the Vickery case."

The Texas Rules of Civil Procedure provide that a judge *shall* recuse himself in any proceeding in which "his impartiality might reasonably be questioned." TEX.R. CIV. P. 18b(2)(a). We review the denial of a motion to recuse for abuse of discretion. TEX.R. CIV. P. 18(a); *McElwee v. McElwee,* 911 S.W.2d 182, 185 (Tex.App.—Houston [1st Dist.] 1995, writ denied).

As Judge Hoffman suggested during the hearing, the comments made by Mease to Catlett could have been mere posturing.[3]

---

**1.** It is not clear from the record how the issue of who would pay the fees was presented to Judge Elliott. Mease testified, "We just made an announcement when that time came that we had agreed to those fees.... I think [Judge Elliott] probably ruled that [the fees] were all reasonable, but he didn't hear testimony."

**2.** Neither the motion for new trial nor the order granting the new trial was entered into evidence at the recusal hearing.

**3.** Judge Hoffman stated:
> [W]e have all heard lawyers say wild things. [Catlett] didn't say that Mr. Mease said that he had the fix in with [Judge Elliott] or that [Judge Elliott] was going to do certain things.

Mease testified that, with respect to the trip to Europe, he paid no part of the Elliott's transportation costs or travel expenses. The record is silent as to why Judge Elliott recused himself from *Platt.* We cannot say Judge Hoffman abused his discretion when he denied the motion to recuse.

We overrule Glenn's first point of error, and Richards' tenth point of error.

## 2. Evidence About the Annuity

In her seventh amended petition, Helen sought a partition of undivided assets that were not discussed or divided in the divorce decree. One of these assets was an annuity that paid approximately $35,000 a month. The monthly check was made payable to both Glenn and Helen. In a 1992 deposition, Glenn stated he was claiming the entire annuity for himself. However, in February 1994, he filed a "Clarification and Supplementation of Deposition Testimony," in which he stated, "I do not have and never have had ownership or control over the annuity itself."

At trial, Glenn's attorney, Raborn, mentioned the annuity in opening argument and the following exchange occurred:

Ms. Raborn: [Helen] has placed herself in the position she finds herself in. And I'm not saying that it is a bad position at all because I think the evidence is going to show that she is going to have half of the annuity for the rest of her life—that is, income of $250,000 for the rest of her life a year [sic].

Mr. Krist [counsel for Helen]: If I may, just for a point of clarification: Is that a judicial admission that Helen is entitled to one-half of the annuity, in open court?

Ms. Raborn: Your Honor, we have had a clarification of the deposition on file for months.

She said certain things would happen, but she didn't ... say how Mr. Mease was going to

Mr. Krist: I'm asking you if this is a judicial admission.

Ms. Raborn: Absolutely it is. Never been in contest from our standpoint and they know it.

After opening argument, the issue of the annuity again came up when the trial court asked the attorneys for a stipulation regarding whether the annuity was an issue in the case. Raborn told the trial court that because of a "misunderstanding in terms of depositions," Glenn filed a sworn "clarification of the deposition." She reiterated that Helen was entitled to one-half of the annuity. Krist noted that the "clarification" affidavit contradicted Glenn's deposition testimony that he was entitled to all of the annuity, and that he intended "to impeach the dickens out of Glenn Vickery with reference to the position that they're now taking."

During Helen's direct examination, she testified about the annuity. Her attorney asked her if she remembered Glenn's deposition testimony regarding the annuity. When Helen stated she did not remember specific testimony, her attorney asked her if looking at the deposition would refresh her recollection. Helen answered that it would, and her attorney gave her the deposition. After asking her a series of questions about the annuity, counsel asked her to read Glenn's deposition. Both Glenn's and Richards' counsel objected that this was an improper use of the deposition. Richards' counsel further objected that Krist and Raborn entered into a stipulation regarding the annuity, upon which Richards was entitled to rely. The trial court overruled the objection, and Helen continued to read portions of Glenn's deposition. The trial court refused to allow Glenn's supplement to his deposition testimony to be admitted as evidence.

Later in the trial, Helen's counsel again read the same portions of Glenn's deposition testimony into the record. Defen-

get it done.

dants' counsel did not object and were allowed to read additional portions of the deposition under the rule of optional completeness.

In Glenn's point of error 2(B), he asserts the trial court erred in allowing Helen to read Glenn's deposition. In Glenn's point of error 2(C) and in Richards' point of error 4(A) and 4(C), the defendants assert the trial court erred in not admitting Glenn's affidavit supplementing his deposition testimony. In point of error 4(B), Richards asserts the trial court erred in not enforcing the stipulations made during opening argument by counsel for Glenn and Helen regarding the annuity.

### A. Helen's use of Glenn's deposition

Glenn asserts that reading his deposition testimony, "not as if he were 'present and testifying,' but rather in the midst of Helen's testimony, was erroneous." He also asserts there is no authority to support Helen's reading Glenn's deposition into the record as a method of refreshing her recollection.

We agree with Helen that Glenn has not demonstrated harm from any alleged error. Glenn does not explain how (or even argue that) the reading of Glenn's deposition testimony by Helen probably caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1(a)(1).[4] After Helen testified, the same deposition excerpts were later read into the record without objection from either defendant. Even assuming the trial court erred in allowing

Helen to read from Glenn's deposition, the error was harmless.

We overrule Glenn's point of error 2(B).

### B. Glenn's supplementation of his deposition

Glenn argued to the trial court that his affidavit supplementing his deposition had been filed pursuant to Tex.R. Civ. P. 166b(6)(a), which provides:

A party is under a duty to reasonably supplement his response [to a discovery request] if he obtains information upon the basis of which:

(1) he knows that the response was incorrect or incomplete when made;

(2) he knows that the response though correct and complete when made is no longer true and complete and the circumstances are such that failure to amend the answer is in substance misleading[.]

Helen, however, argued to the trial court the supplementation was an improper attempt to correct a deposition. The trial court agreed with Helen, stating Glenn had not complied with Tex.R. Civ. P. 205, the rule governing how changes to deposition testimony are to be made.[5]

In point of error 2(c), Glenn asserts his affidavit was not a correction to his deposition, but was "clearly supplemental," and was necessary because Helen and her counsel had misinterpreted his deposition statements regarding the annuity, and that "in an attempt to clarify this stance, a more complete statement was provided...."

---

4. Since the date that this case originally issued, the Texas Rules of Appellate Procedure have been substantially revised. *See* Order Approving the Texas Rules of Appellate Procedure, Misc. Docket No. 9709134 (Tex. Aug. 15, 1997). Because application of then new rules will not substantively affect the disposition of this case, all references herein are to the new rules.

5. The trial judge stated:
[T]he Court does not find in the affidavit that Glenn Vickery changes his testimony

as to the deposition testimony, twice relating to the fact that the annuity checks were his property.

Now the affidavit sets out, which we we [sic] have had testimony in regards to and between the parties of what they were going to do. But at no place do I see in this affidavit that Glenn Vickery says that I do not own that annuity.

And therefore, the Court finds that Rule 205 has not been complied with; and this supplementation will not be allowed.

We agree with Helen that rule 166b(6)(a) is inapplicable. Glenn does not argue his deposition statements were incorrect or incomplete when made, or the statements were correct and complete when made, but were no longer true and complete. He asserts his statements had been misinterpreted, and he needed to *clarify*—not correct or complete—them.

Glenn also asserts his affidavit was admissible under the rule of optional completeness. That rule provides in part:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may at that time introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Tex.R. Civ. Evid. 106.

We are not convinced that rule 106 applies. Under the rule of optional completeness, if one party introduces part of a statement or document, the opposing party may contemporaneously introduce as much of the balance as is necessary to explain the first part. *Jones v. Colley*, 820 S.W.2d 863, 866 (Tex.App.—Texarkana 1991, writ denied). The rule is based on two considerations: (1) the danger that material may be made misleading by being taken out of context, and (2) the inadequacy of delayed repair. *Id.* In his deposition, Glenn stated that under the terms of the divorce decree, the annuity had been awarded to him as a right or privilege arising out of the operation of his business.[6] He also affirmatively answered the question, "[Y]ou're claiming the entire annuity for yourself?" In his affidavit, executed more than a year after the deposition, Glenn stated that he would control and manage the annuity checks until Helen moved from the ranch and then

> [a]t that time, we would make arrangements to have separate [annuity] checks issued to each of us individually.... I

do not have and have never had ownership or control over the annuity itself.

The affidavit is not a part of the deposition. There is no argument that the deposition excerpts were taken out of context and are therefore misleading. Glenn sought to "clarify" his deposition testimony by contradicting it. Rule 106 is inapplicable.

Moreover, Glenn's videotaped deposition, played to the jury during his case-in-chief, contained a statement somewhat similar to the statement in the affidavit; he testified that he and Helen had reached an agreement by which he would give her one-half the annuity "after the June Wright case seemed to be going, fading away." Although this statement does not contain the express disavowal that he did not own or control the annuity, it reflects an intention to share the annuity with Helen. We conclude Glenn was not harmed by the exclusion of the affidavit.

Richards asserts in point of error 4(C) that the trial court erred in not permitting Glenn to supplement his deposition with the affidavit because Glenn had a duty to supplement under rule 166b. She provides no argument or authority for this proposition. Richards has waived point of error 4(C). *See* Tex.R.App. P. 38.1(h). Moreover, we have already held that rule 166b does not apply.

In point of error 4(A), Richards asserts the trial court erred because the ownership of the annuity was as a matter of law partitioned prior to the divorce pursuant to section 3.52 of the Texas Family Code (Vernon 1993). Richards does not support this assertion with explanation, argument, or authority. She has waived point of error 4(A). *See* Tex.R.App. P. 38.1(h).

In point of error 4(B), Richards asserts the trial court erred by not enforcing the stipulation made by Helen during Glenn's opening argument. She has provided neither argument nor authority to support

---

**6.** The annuity was purchased with the proceeds of a large legal fee.

this assertion. Point of error 4(B) is waived. *See* Tex.R.App. P. 38.1(h).

We overrule Glenn's point of error 2(C) and Richards' point of error 4(A), (B), and (C).

## 3. The Jury Charge

In Glenn's point of error four, he asserts "[t]he trial court erred in failing to include in the charge to the jury any and all questions tendered by Glenn, including his affirmative defenses." He specifically argues the trial court apparently denied his proposed questions on the basis of Helen's trial amendment, in which she asserted Glenn was judicially estopped from asserting any rights based on the June 18 agreement. In a portion of Richards' point of error seven, she asserts the trial court erred in refusing her tendered jury questions on the issues of ratification and estoppel. Richards adopts Glenn's arguments and authorities regarding these issues.

To determine whether an alleged error in the jury charge is reversible, we must consider the pleadings, the evidence presented at trial, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986); *Merckling v. Curtis,* 911 S.W.2d 759, 767 (Tex.App.—Houston [1st Dist.] 1995, writ denied). Error in the charge is reversible only if harmful—in other words, if it probably caused the rendition of an improper judgment. Tex. R.App. P. 44.1(a)(1); *see Island Recreational Dev. Corp.,* 710 S.W.2d at 555; *Merckling,* 911 S.W.2d at 767.

### A. Glenn's tendered and refused questions

Glenn's tendered questions asked if Helen:

breached any of the three agreements [7] (question A);

was estopped from claiming that any of the three agreements was enforceable (question C);

was guilty of laches with respect to any of the three agreements (question D);

waived her right to disaffirm any of the three agreements (question E);

reached an accord and satisfaction with Glenn by signing the June 18 agreement (question F);

effected a novation by signing the May 1992 nunc pro tunc decree or the June 18 agreement (question G); or

ratified any of the three agreements (question H).

In response to Helen's trial amendment, Glenn also tendered questions regarding his counterclaim for breach of contract and his affirmative defenses of estoppel, laches, waiver, novation, and ratification that referred only to the divorce decree and nunc pro tunc decree and contained no reference to the June 18 agreement.

Helen asserts that Glenn's tendered questions were immaterial because "[i]t is the very essence of a bill of review action that a party is entitled to set aside a prior judgment, and is not by any theory estopped from doing so, if she can prove that the judgment was the result of fraud."

The jury affirmatively answered the question, "Did Glenn Vickery commit fraud against Helen Vickery in the division of the marital property of Helen Vickery and Glenn Vickery?" It also found the division of marital property between Helen and Glenn was the result of extrinsic fraud unmixed with any negligence on Helen's part. The jury was instructed there are two types of fraud and was required to answer separately for each type. The jury was instructed fraud occurs when:

a. a party makes a material misrepresentation,

b. the misrepresentation is made with the knowledge of its falsity or made

---

7. The November 1991 divorce decree, the May 1992 nunc pro tunc decree, and the June 18 agreement.

recklessly without any knowledge of the truth and as a positive assertion,

c. the misrepresentation is made with the intention that it should be acted on by the other party, and

d. the other party acts in reliance on the misrepresentation and thereby suffers injury.

The jury was further instructed that fraud also occurs when:

a. a party conceals or fails to disclose a material fact within the knowledge of that party,

b. the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

c. the party intends to induce the other party to take some action by concealing or failing to disclose the fact; and

d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

## B. Breach of contract

Glenn asserts the trial court erred in refusing his tendered questions regarding breach of contract because Helen's failure to comply with the three agreements was raised by the pleadings. The jury found Glenn committed fraud against Helen in the division of the couple's marital property. We read this question to encompass all three agreements. Helen's fraud claim was based on her assertion that Glenn tricked her into getting a sham divorce as a means to protect their assets from the June Wright malpractice case. A June 10, 1992, letter from Helen's attorney to Glenn's attorney reflects Helen still believed the June Wright malpractice case posed a threat to the couple's assets. However, unbeknownst to Helen, June

Wright had offered to settle the case within Glenn's policy limits in October 1991, and the malpractice case actually settled on June 5, 1992—two weeks before Helen signed the June 18 agreement—for less than Glenn's policy limits.

Fraud vitiates every transaction tainted by it. *Middleman v. Atlantic Mut. Ins. Co.*, 597 S.W.2d 565, 568 (Tex.Civ.App.—Waco 1980, writ ref'd n.r.e.). There is no real assent to any agreement induced by fraud. *Id.* The jury found Glenn committed fraud. Thus, the three "agreements" were vitiated. Helen could not breach a contract vitiated by fraud. Any error in failing to submit Glenn's questions regarding breach of contract was harmless.

## C. Estoppel

Glenn asserts the trial court erred in denying submission of his questions and definitions regarding estoppel. He asserts it was error because estoppel was "pleaded and proved by her signing of the original, as well as subsequent decree and contract." He further asserts that Helen judicially admitted that the November 1991 decree and May 1992 nunc pro tunc decree "existed and were enforceable" and is therefore "estopped from denying their enforceability."

We again note fraud vitiates every transaction tainted by it. The jury found Glenn committed fraud. Helen is not estopped from claiming the documents she signed are unenforceable. Moreover, we have looked at Glenn's sole record reference in support of his assertion Helen "stipulated to the existence and effectiveness of both the November 1991 decree and the subsequent May 1992 Nunc Pro Tunc decree," and find it does not support his contention.[8]

## D. Laches

---

**8.** At the hearing on Glenn's motion to enforce, during Glenn's direct examination, Helen's counsel stated:

I would stipulate that the parties before us [sic] original decree was dated November

1991; and that a Nunc Pro Tunc decree was entered subsequently on the date reflected in that; and that the only issue [at this hearing] is the provision on page 15 and 16 with reference to the Liberty County residence.

Laches is an equitable remedy that prevents a plaintiff from asserting a claim because of a lapse of time; the claim is said to be stale. *Bluebonnet Sav. Bank, F.S.B. v. Grayridge Apartment Homes, Inc.*, 907 S.W.2d 904, 912 (Tex.App.— Houston [1st Dist.] 1995, writ denied). The two essential elements of laches are: (1) an unreasonable delay by one having legal or equitable rights in asserting them, and (2) a good faith change of position by another to his detriment because of the delay. *Rogers v. Ricane Enter., Inc.*, 772 S.W.2d 76, 80 (Tex.1989). Although a court applying the doctrine of laches is not bound by any statute of limitations, the statute of limitations is one measure of whether a claim has become stale. *Bluebonnet Sav. Bank*, 907 S.W.2d at 912. Laches does not bar a plaintiff's suit before the statute of limitations has run unless estoppel or extraordinary circumstances are present. *Id.*

Glenn asserts he pled and proved a delay that worked to his disadvantage. He does not explain how he was disadvantaged, however—he refers only to his own pleadings and to the three agreements. Glenn has not established that his defense of laches was raised by the evidence. Moreover, Glenn does not argue extraordinary circumstances exist that would bar Helen's claim. Any error in refusing Glenn's questions regarding laches is harmless.

### E. Waiver

Glenn asserts the trial court erred in failing to submit his tendered questions regarding waiver because "waiver, which is the voluntary relinquishment of a known right, was pleaded and proved by Helen's signing of the two decrees." As we have noted, there is no real assent to any agreement induced by fraud. The jury found Glenn committed fraud. Any error in the trial court's failure to submit Glenn's questions regarding waiver is harmless.

### F. Accord and satisfaction

Glenn asserts the trial court erred in refusing his question regarding whether "an accord and satisfaction was reached between Helen and Glenn by the signing of the ⁶⁄₁₈ agreement." He further argues, "Helen certainly had the right to seek a division of property, however, she signed and accepted the benefits of the November 1991 and May 1992 property divisions in the decrees in accord and satisfaction of this right."

The tendered question asked, "Was an accord and satisfaction reached between Helen Vickery and Glenn Vickery by the signing of the *6/18/92 agreement?*" (Emphasis added.) However, his argument on appeal in support of this issue seems to be based on Helen's signing of the November 1991 decree and the May 1992 nunc pro tunc decree, not the June 18 agreement. To the extent we understand his argument on appeal, it appears Glenn has not supported his assertion that the June 18 agreement constituted an accord and satisfaction with any argument. Glenn has waived any error with respect to this issue.

Moreover, we conclude that the jury's finding of fraud rendered harmless any error in refusing Glenn's questions on this issue. An accord requires a bargaining evidenced in a new contract, either express or implied, that replaces an old agreement. *Bueckner v. Hamel*, 886 S.W.2d 368, 372 (Tex.App.—Houston [1st Dist.] 1994, writ denied). In the new contract, the parties *mutually agree* that one party may give or perform, and the other will accept, something different from what each was expecting from the old contract. *Id.* The satisfaction is the actual performance of the new agreement. *Id.* As we have noted, there is no real assent to any agreement induced by fraud. Thus, in light of the jury's finding of fraud, there could be no accord because there was no mutual agreement.

### G. Novation

Glenn asserts the trial court erred in refusing his questions regarding whether a novation was effected when Helen signed

the May 1992 nunc pro tunc decree or the June 18 agreement. The essential elements of a novation are: (1) a previous, valid obligation; (2) a mutual agreement of the parties to the acceptance of a new contract; (3) the extinguishment of the old contract; and (4) the validity of the new contract. *Flanagan v. Martin*, 880 S.W.2d 863, 867 (Tex.App.—Waco 1994, writ dism'd w.o.j.); *Mandell v. Hamman Oil and Ref. Co.*, 822 S.W.2d 153, 163 (Tex. App.—Houston [1st Dist.] 1991, writ denied).

As we have repeatedly stated, fraud vitiates every transaction tainted by it, and there is no real assent to any agreement induced by fraud. Because the jury found Glenn committed fraud, he cannot establish the first, second, or fourth elements of novation—there was no *valid* previous obligation, no mutual agreement to the acceptance of a new contract, and no valid new contract. Any error in failing to submit the tendered question regarding novation is harmless.

### H. Ratification

Glenn asserts the trial court erred in refusing his questions regarding whether Helen ratified any or all of the three agreements. He states ratification rests upon a manifestation of assent to confirm one's prior act or that of another, and ratification was "pleaded and proved ... by Helen's signing." We assume Glenn refers to Helen's signing of the three agreements. Again, there can be no real assent to any agreement induced by fraud; if Helen was induced by fraud to sign the three agreements, she cannot have manifested assent to the documents she signed. Any error in refusing the tendered questions and instructions regarding ratification was harmless.

### I. Conclusion

**9.** The questions about which Glenn complains are those that asked (1) whether Glenn breached his fiduciary duty to Helen concerning the division of marital property, (2) (predicated on the previous question) whether the

We overrule Glenn's point of error four and that portion of Richards' point of error seven that deals with alleged error in refusing her tendered jury questions.

### 4. Objections to the Charge

In Glenn's point of error five and Richards' point of error seven, the appellants assert the trial court erred in overruling numerous objections to the charge.

### A. Necessity of predicating fraud and fiduciary duty questions on bill of review

Glenn asserts that because this was a bill of review proceeding, the questions attacking the underlying judgment[9] had to be predicated upon a finding that Helen was entitled to bill of review relief. He asserts,

> The manner in which these questions were presented had the effect of providing Helen a remedy in addition to bill of review and, at the very least, if even proper, should have been predicated upon a finding supporting bill of review relief. Helen could not have brought a bill of review if these actions could have been brought independently. To present these issues independently, without predicate, was error.

We understand Glenn's argument on appeal to be twofold: (1) the complained-of questions should have been predicated upon a finding that Helen was entitled to bill of review relief, and (2) Helen was not entitled to bill of review relief if she was entitled to bring an independent action for breach of fiduciary duty and fraud. Glenn has not pointed to any place in the record where this latter complaint was raised before the trial court. Any argument is therefore waived. Additionally, Glenn has not provided any authority for the proposition that the complained-of questions had to be predicated on a finding that Helen

breach of fiduciary duty was committed with the intent to cause harm, and (3) whether Glenn committed fraud against Helen with respect to the division of marital property.

was entitled to bill of review relief. Finally, although the complained-of questions were not predicated on a finding that Helen was entitled to bill of review relief, a bill of review question was submitted to the jury; the jury found that the division of marital property was the result of extrinsic fraud on Glenn's part, unmixed with any negligence on Helen's part. Thus, any error would be harmless. *See* Tex.R.App. P. 44.1.

**B.  Use of the term "marital property"**

Both Glenn and Richards complain about the use of the term "marital property" in jury questions one, three, four, five, and six.

The general instructions that preceded the charge defined separate and community property. Question number one asked, "Did Glenn Vickery breach his fiduciary duty to Helen Vickery concerning the division of the marital property of Helen Vickery and Glenn Vickery?" Question three asked, "Did Dianne Richards breach her fiduciary duty to Helen Vickery while representing Helen Vickery in the divorce and marital property division between Helen Vickery and Glenn Vickery?" Question four asked if Glenn committed fraud against Helen in the division of the couple's marital property. Question five asked if the division of the couple's marital property was the result of extrinsic fraud by Glenn, unmixed with any negligence on Helen's part. Question six, a damage question predicated on the answers to questions one and four, asked what sum of money would compensate Helen for her damages caused by the fraud or breach of fiduciary duty of Glenn "concerning the division of the marital property" of the couple. Question 6A, a damage question identical to question six, related to Richards. The instructions to all these ques-

tions defined marital property as "all the community and separate property owned by either or both spouses as of November 22, 1991."

Richards and Glenn argue that the trial court erred in using the phrase "marital property" because it allowed the jury to take into consideration Glenn's separate property as well as the couple's community property. Glenn states, "The term 'marital property' as used in the charge skewed the property the jury could consider and ultimately affected the judgment."

Any error in the use of the term "marital property" was harmless. The judgment does not award Helen the damages found by the jury for "loss of marital property." With respect to Glenn, the trial court made its own division of property;[10] with respect to Richards, the trial court awarded Helen only the damages for mental anguish, and not the damages found by the jury for loss of marital property.

**C.  Fiduciary duty**

Glenn asserts that the trial court erred in allowing question one, which asked if Glenn breached his fiduciary duty to Helen, because it assumed a fiduciary duty between Glenn and Helen, "which existence of such fiduciary relationship should have, at the very least, been a predicate to this question."

A husband and wife owe each other special fiduciary duties. *Matthews v. Matthews*, 725 S.W.2d 275, 279 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). Additionally, we think it is significant that Glenn is an attorney. To the extent that Glenn was advising Helen of the legal aspects of a transaction by which he would benefit, Glenn assumed the "high duty of an attorney to his client." *Bohn v. Bohn*, 455 S.W.2d 401, 412 (Tex.Civ.App.—Houston [1st Dist.] 1970, writ dism'd). Because Glenn had a fiduciary duty to Helen as a

---

**10.**  See disposition of Glenn's points of error nine, 10, and 11 regarding the division of property.

matter of law, the trial court did not err in overruling Glenn's objection to question one.

Richards complains about the definition of fiduciary duty in jury question three. That instruction provides:

The relationship between an attorney and client is highly fiduciary in nature. A fiduciary relationship is one of special trust and confidence and the law requires that all dealings between an attorney and client be characterized by the utmost good faith, candor and honesty. An attorney must affirmatively disclose to his client all material facts bearing on the client's case, as well as the legal consequences flowing from the facts. A "material fact" is a fact which a reasonable person under the same or similar circumstances, would attach importance to in determining his course of conduct or action.

Richards asserts on appeal:

Jury question 3[,] which was submitted over Appellant[']s objections[,] only inquires whether there was a technical breach by failing to reveal a material fact in the divorce or in marital property division[, and] does not inquire whether Appellee was harmed.... Appellant also objected to the Jury Question 3 because it does not contain the caveat ["]to a material fact [ ] which is known to the attorney." ... Appellant also objected to the word "highly" in the Instruction to Jury Question 3 as a comment on the weight of the evidence because a fiduciary duty exists between the attorney and client and is not "highly fiduciary in nature."

We understand Richards' first complaint to be that question three was erroneous because it did not ask whether Helen had been damaged by Richards' actions. In question 6A, the jury was asked what amount of damages would compensate Helen for "her damages, *if any,* that were proximately caused by the breach of fidu-

ciary duty by Dianne Richards, *if any* ...." Any error in omitting an inquiry regarding injury in question six is therefore harmless. We hold that the omission of the phrase "which is known to the attorney" from the instruction was not error because it is necessarily implicit. Finally, we hold that it was not error to describe the relationship between an attorney and client as "highly fiduciary." *See Judwin Properties, Inc. v. Griggs & Harrison,* 911 S.W.2d 498, 506 (Tex.App.—Houston [1st Dist.] 1995, no writ) ("The attorney-client relationship is highly fiduciary in nature.").

### D. Fraud

Glenn asserts the fraud question submitted to the jury was "a shade and phase of Glenn's alleged breach of fiduciary duty" and the submission was therefore erroneous. The authorities upon which he relies stand for the proposition that the breach of the fiduciary relationship existing between a husband and wife as to the community property controlled by each spouse is termed a "fraud on the community." *In re Marriage of Moore,* 890 S.W.2d 821, 827 (Tex.App.—Amarillo 1994, no writ). In *Moore,* the court of appeals stated:

Any such conduct in the marital relationship is termed fraud on the community because, although not actually fraudulent, it has all the consequences and legal effects of actual fraud in that such conduct tends to deceive the other spouse or violate confidences that exist as a result of the marriage.

*Id.* However, the fraud question in this case asked if Glenn committed actual fraud, not constructive fraud.

"Fraud on the community" is a claim by one spouse against another for improper depletion of the community estate prior to dissolution of the the community. *Belz v. Belz,* 667 S.W.2d 240, 246 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). Fraud on the community is not permitted as an independent cause of action in a divorce suit; it is a wrong by one spouse that the court can consider in its division of property and

may justify an unequal disposition of the property. *Id.* at 247.

However, a spouse may, in the context of a divorce, recover for other intentional torts committed upon the spouse during marriage. *Moore,* 890 S.W.2d at 828. The distinction is that in such cases, the tort is committed upon the spouse's separate estate, while fraud on the community is necessarily perpetrated on a spouse's interest in the community. *Id.*

In this case, Helen does not allege that Glenn committed constructive fraud by improperly depleting or concealing community assets. Such a claim would be considered a fraud against the community estate and could not be brought as an independent cause of action. *Belz,* 667 S.W.2d at 246–47. Instead, Helen claims that Glenn committed actual fraud against her individually by fraudulently inducing her into agreeing to a divorce and a *contractual* division of property. Helen's claim is that but for Glenn's misrepresentations about the reasons for the divorce, she would never have agreed to the divorce or signed a contract dividing the community property.

Thus, we hold that Helen's claim is not one of constructive fraud on the community, but of actual fraud perpetrated against her individually. The actual fraud against her caused mental anguish damages, *i.e.,* damages recoverable by her separate estate. *Cf., Moore* 890 S.W.2d at 829–30 (mental anguish damages not recoverable if the cause of action is one of fraud on the community). *Moore* and *Belz* do not support Glenn's contention that the submission of the fraud question in this case was erroneous.

Glenn also complains that the fraud question did not "specify a time frame that the alleged fraud was perpetrated." He asserts this was error because "different facts existed in November of 1991 versus May of 1992; specifically, Appellant had a right to know when the jury deemed this

fraud occurred because if such was nonexistent in May of 1992, Helen's voluntary signing at that time may have wiped out any error associated with the November signing." Glenn has provided no authority for his argument that the broad form submission in this case was improper. We find no error in the submission of the question.

### E. The bill of review question

Question five asked whether the division of marital property between Helen and Glenn was the result of extrinsic fraud by Glenn, unmixed with any negligence on Helen's part. Glenn raised a number of objections to this question. On appeal, he argues that the question was improper because it did not inquire about fault (in addition to negligence) on Helen's part, did not inquire about the fault or negligence of Richards, and did not specifically reference the November 1991 decree or the May 1992 nunc pro tunc decree.

We hold that any error in submitting the bill of review question is harmless. As we discuss more fully in our disposition of Glenn's points of error seven and eight, the trial court divided the marital estate pursuant to granting the bill of review and alternatively as a division of property undivided by the divorce decree or the nunc pro tunc decree. Glenn does not challenge the alternative reason given by the trial court for dividing the marital estate.

### F. Damages

Question six was predicated on questions one and four, and asked the jury what sum of money would compensate Helen for "her damages, if any, that were proximately caused by the breach of fiduciary duty by Glenn Vickery, or the fraud, if any, by Glenn Vickery, concerning the division of the marital property" of Helen and Glenn. The jury was asked to determine the amount of damages for loss of marital property and for mental anguish. It awarded $6,700,000 for loss of marital property and $1,300,000 for mental anguish. The trial court rendered judgment

for the $1,300,000 in mental anguish damages and prejudgment interest on the damages for loss of marital property.

Glenn raises the following complaints regarding question six: (1) because this was a bill of review case, Helen was not entitled to a damage question; (2) the just and right division of property was solely within the province of the trial court, and the jury could not decide this issue; (3) there is not a separate cause of action for fraud for which damages may be recouped by one spouse against another; (4) although the jury was instructed that one of the factors it could consider in awarding damages was the "enhancement of value of separate property," there were no pleadings to support reimbursement; and (5) mental anguish is not "an element of recoverable damages for breach of fiduciary duty and/or fraud."

Glenn asserts that a bill of review "should not culminate in a money judgment, but rather requires that the portion of the original judgment be set aside and a new judgment rendered." We assume this complaint refers to the award for loss of marital property, and not the award for mental anguish. Glenn relies upon *Kessler v. Kessler*, 693 S.W.2d 522 (Tex.App.— Corpus Christi 1985, writ ref'd n.r.e.), which provides in part:

> A bill of review proceeding based on extrinsic fraud does not contemplate the rendition of a judgment which merely awards the petitioner money because of such fraud, but it contemplates a re-examination of the entire case and the rendition of a judgment which fairly and finally disposes of all issues raised in the original trial and in the bill of review itself.

693 S.W.2d at 526. Here, although the jury found that Helen's damages for loss

of marital property totalled $6.7 million, the trial court did not render judgment for this amount. The trial court made a division of the marital property and awarded Helen only the prejudgment interest on the $6.7 million. Thus, Helen did not receive a money judgment for Glenn's fraud with respect to her loss of marital property; she received only prejudgment interest on that amount. In this point of error, Glenn does not argue that Helen was not entitled to this prejudgment interest. His complaint regarding the award for loss of marital property is without merit.

Glenn also argues the jury could not make a just and right division of the property. To the extent we understand this complaint, we hold it is without merit.[11] The trial court made the division of property.

Glenn argues that he objected at trial to question six regarding damages for fraud because "there is not a separate cause of action for which damages may be recouped by one spouse against another for fraud *during* marriage, but may only be considered by the trial judge in awarding a disproportionate division of the community estate to the injured spouse." He again cites *Moore*, with no additional argument or authority to support this assertion.

We find *Moore* distinguishable. In *Moore*, the Amarillo Court of Appeals held that no separate cause of action for fraud on the community exists in a divorce action. 890 S.W.2d at 828. Fraud on the community is "perpetrated upon a spouse's interest in the community estate of the parties." *Id.* Here, Helen claimed that Glenn fraudulently induced her to sign the divorce decree by representing to her that they would reunite after the malpractice suit threat had passed. The misrepresentations affected more than Helen's share of the community property; she acquiesced

---

11. The jury was instructed that "loss of marital property" was

> a sum of money, if any, that you may award to Helen Vickery equal to the value, as of November 22, 1991, of a just and right

division of the estate of Glenn Vickery and Helen Vickery, over and above that amount which Helen Vickery actually received from the division of marital property . . . .

to a divorce she did not want on the belief that she and Glenn would reunite. Moreover, Glenn's fraud continued after the divorce. We hold this complaint is without merit.

Glenn next asserts the trial court erroneously instructed that one of the factors the jury could consider in its award of damages was the "[e]nhancement of value of separate property through community contribution of money, time, talent, labor and effort." Glenn objected because there were no pleadings or evidence to support reimbursement. Specifically, Glenn asserts that although there was evidence of the cost of improvements to the property, there was no evidence of enhancement of the property. We assume the separate property to which Glenn refers is Moss Hill. He argues that this factor prejudiced the jury into giving Helen a larger judgment than it otherwise would have awarded. He cites *Anderson v. Gilliland,* 684 S.W.2d 673, 675 (Tex.1985), "which holds that a claim for reimbursement for funds expended by an estate for improvements to another estate is to be measured by the enhancement in value of the benefitted estate."

In response, Helen asserts:

Glenn's complaint about the lack of pleadings to support reimbursement is particularly galling because it goes to the heart of what this lawsuit is all about. *Of course* there were no pleadings to support reimbursement because Helen's purported attorney, Dianne Richards, was actually working for Glenn. As part of the damages for fraud, the jury was entitled to consider what Helen fairly and reasonably would have had if Glenn had not set her up with a sham-attorney as part of his fraudulent scheme.

Helen's argument concerns the pleadings in the underlying divorce suit. However, we understand Glenn's complaints to address the pleadings in the bill of review action, not the underlying divorce. Unfortunately, Helen provides no other argument relating to this issue.

Nonetheless, we find any error in the submission of this factor in the instruction to be harmless. The jury was instructed that one of the 12 factors it could consider in awarding damages for loss of marital property was the enhancement of the value of any separate property. However, Helen elected to not recover her damages for loss of marital property; instead she took the property in kind after the trial court made a new division. Any error in instructing the jury about how to calculate damages for loss of marital property was harmless.

Finally, Glenn asserts the trial court erred in submitting a damage issue as to mental anguish. Specifically, he asserts:

[I]t was error for the trial court to submit a damage issue as to mental anguish for numerous reasons. First, mental anguish is not "an element of recoverable damages for breach of fiduciary duty and/or fraud," in a divorce action such as this[;] however, such objection was overruled. *See In re Marriage of Moore,* 890 S.W.2d at 829–30.

This comprises all of Glenn's argument on this issue; Glenn does not identify any of the other "numerous reasons" why the trial court erred. We have already found *Moore* to be distinguishable. Glenn has not identified a reason why submission of the damage issue regarding mental anguish was error.

We overrule Glenn's point of error five and Richards' point of error seven.

## 5. The Trial Amendment

In Glenn's point of error three and Richards' point of error six,[12] the defendants

---

**12.** Richards has not briefed this issue. She adopts Glenn's argument and authorities with     respect to this issue.

complain that the trial court erred in granting Helen's trial amendment. After the close of evidence, Helen's counsel tendered a proposed trial amendment. In the trial amendment, Helen argued that Glenn was judicially estopped from relying on the June 18 agreement because at the August 5, 1992, hearing on his motion to enforce, he had relied on the divorce decree and nunc pro tunc decree. She asserted that by arguing that the June 18 agreement was an enforceable agreement, Glenn was taking a position that was "totally inconsistent with the position taken in the proceeding to enforce decree which was heard on August 5, 1992." [13] The trial amendment specifically asked the court to disallow any jury issue raised by the June 18 agreement. The trial court agreed, allowing Helen to file the trial amendment and stating that judicial estoppel would control.

As we noted in our disposition of Glenn's point of error four and Richards' point of error seven, the jury found fraud which vitiated the June 18 agreement. Therefore, we conclude that any error in allowing the trial amendment was harmless. We overrule Glenn's third point of error and Richards' sixth point of error.

### Points of Error Relating Solely to Glenn

#### 1. The Motion for Continuance

In point of error 2(A), Glenn asserts the trial court erred in denying his motion for a continuance.

Glenn has Crohn's disease. On May 9, 1994, the first day of trial, he became ill. Before voir dire began, his attorney, Burta Raborn, asked the trial court's permission for Glenn to see his doctor. Raborn told the trial court:

Well, I'm not suggesting a continuance at this time at all, Judge. I have told my client—I want to be very candid with the Court—I have told my client that I am prepared to try the case. I think its within his interest to try the case; and I think it is imperative that he be available to me to try the case. I said, I probably could get through voir dire without him today if necessary, but that he needs to get himself in shape if he can to assist me during the trial. . . .

The trial court told the jury panel only that Glenn was excused from voir dire. The jury was selected that day.

The following day, Raborn informed the trial court that Glenn was extremely ill, had been admitted to the hospital, and would be undergoing tests to determine the seriousness of his condition. The trial court told the jury that Glenn was ill and would not be in court that day. After the attorneys made their opening statements, Helen was called to the stand to testify.

The third day of trial, before Helen's testimony continued, Raborn told the trial court that, after talking to Glenn's doctor, "I personally have reached the conclusion that I'm not going to have Mr. Vickery available to me for the trial of this case. Not only is he not available to me, he's apparently on some sort of drug I.V.'s and I can't talk to him." Raborn said she was getting an affidavit from Glenn's doctor, and would be moving for a continuance. She stated:

[W]e have had long depositions. Everybody may be ready to go forwards [sic] on depositions. I don't know. I'm just trying to tell everybody what the situation is and what I'm going to do as soon as I have Dr. Schwartz's affidavit. And, quite frankly, whatever happens happens. It's out of my control.

---

13. The original divorce decree and nunc pro tunc judgment provided that Glenn would take possession of Moss Hill "when [Helen] moves into the Houston residence during the summer of 1992. . . ." The handwritten June 18 agreement (signed by Helen and Glenn during settlement negotiations) provided that "Helen leaves House on or before December 31, 1992. . . ." Glenn received the relief he sought at the hearing on his motion to enforce—Helen was ordered to leave Moss Hill at the end of August 1992.

Helen was then recalled to the stand to continue direct examination.

After the noon recess, Raborn filed Glenn's motion for continuance. The grounds for continuance were:

Defendant's presence at trial ... is essential for his attorneys to adequately represent him in this matter. Further, Defendant will be gravely prejudiced if this trial is allowed to proceed without his presence and [his absence] will in all likelihood deprive Defendant of the opportunity to receive a fair and equitable verdict.

The motion was supported by the affidavit of Glenn's physician, Dr. Jim Schmaltz, who diagnosed Glenn's condition as an "exacerbation or flare up of his Crohn's colitis." Dr. Schmaltz stated that "it would be life threatening" for Glenn to leave the hospital, that his current medication—a morphine drip—caused "heavy sedation and inability to provide clarity of thought" and that medical treatment would be necessary for a week and a half to two weeks.

Raborn argued to the court that she needed Glenn at trial "for the purpose of assisting in his defense and for purposes of testifying." She specifically argued that although Glenn had been deposed, the depositions had not been taken with the expectation that Glenn would not be available for trial. The trial court denied the motion for continuance.

A continuance shall not be granted except for sufficient cause, supported by affidavit, or by consent of the parties, or by operation of law. TEX.R. CIV. P. 251. If the ground of a motion for continuance is "the want of testimony, the party applying therefor shall make affidavit that such testimony is material, showing the materiality thereof, and that he has used due diligence to procure such testimony...." TEX.R. CIV. P. 252.

We will not disturb a trial court's denial of a motion for continuance unless the trial court has committed a clear abuse of discretion. *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex.1986); *Levinthal v. Kelsey–Seybold Clinic, P.A.*, 902 S.W.2d 508, 510 (Tex.App.—Houston [1st Dist.] 1994, no writ).

The mere absence of a party does not entitle him to a continuance. *Humphrey v. Ahlschlager*, 778 S.W.2d 480, 483 (Tex.App.—Dallas 1989, no writ); *Brown v. Brown*, 599 S.W.2d 135, 137 (Tex.Civ.App.—Corpus Christi 1980, no writ). The absent party must show that he had a reasonable excuse for not being present, and that he was prejudiced by his absence. *Green v. State*, 589 S.W.2d 160, 163 (Tex.Civ.App.—Tyler 1979, no writ); *Erback v. Donald*, 170 S.W.2d 289, 291–92 (Tex.Civ.App.—Fort Worth 1943, no writ). A reasonable excuse for not being present does not require reversal if no prejudice is shown. *Green*, 589 S.W.2d at 163; *Erback*, 170 S.W.2d at 291–92.

If the ground of the motion is the necessity of the testimony of an absent party, the movant must show, among other things, that the testimony is material and what is expected to be proved by the testimony. *Brown*, 599 S.W.2d at 137; *see also Doyle v. Doyle*, 482 S.W.2d 285, 286 (Tex.Civ.App.—Beaumont 1972, no writ) (no abuse of discretion in denying continuance when motion stated only that defendant was in jail but did not identify matters to which he would testify).

Here, Glenn's motion asserts without additional explanation that his presence at trial was essential for his attorneys to adequately represent him. Raborn argued to the trial court that Glenn's presence was necessary to assist in his defense and "for purposes of testifying." She did not state why his presence was necessary to assist in his defense, she did not identify the matters to which he would testify, and she did not state why his deposition testimony was insufficient. Glenn asserts on appeal that his depositions were taken as a means of discovery, not as a means of preserving testimony. However, in the absence of any explanation as to why his deposition testimony was inadequate, or what he

would have testified to at trial had a continuance been granted, he has not demonstrated that he was prejudiced by his absence from the trial.

Glenn relies on *Burke v. Scott*, 410 S.W.2d 826 (Tex.Civ.App.—Austin 1967, writ ref'd n.r.e.). *Burke* is distinguishable. In *Burke*, the defendant had been in ill health for some time. Because his appearance at trial was uncertain, counsel for both parties agreed to take the defendant's deposition, but he became too ill to complete the deposition. 410 S.W.2d at 828. He was hospitalized, too ill to even confer with his lawyer in preparation for trial. *Id.* at 829. T.A. Bollinger, the only other person who could assist the defendant's lawyer, suffered a heart attack the day before trial. The defendant's motion for continuance set out the facts to which he and Bollinger would testify at trial. *Id.* The court of appeals held that a continuance should have been granted either under rule 251, because the defendant was physically and mentally unable to undertake his defense, or under rule 252, for want of testimony. *Id.* Here, however, Glenn had been deposed; indeed, Raborn, Glenn's attorney, stated that the parties might go forward on the depositions. Further, the record does not reflect the facts to which Glenn would have testified, or why his deposition was inadequate.

We cannot say the trial court abused its discretion in denying Glenn's motion for continuance. We overrule Glenn's point of error 2(A).

## 2. Allyn Hoaglund's Testimony

In point of error 2(D), Glenn asserts the trial court erred in "permitting the testimony of Allyn Hoaglund for the reason the same was part of settlement discussions, a violation of TEX.R. CIV. EVID. 408, and more prejudicial than probative, especially when erroneously presented as a violation of disciplinary rules." Allyn Hoaglund, an attorney, had been Helen's friend since childhood. He also had worked for Glenn's law firm. Hoaglund testified that Glenn asked him to "relay some information" to Helen "to see if she was interested." Glenn told Hoaglund he was willing to abide by the terms of the handwritten agreement he and Helen had signed on June 18, 1992, and would pay Helen an additional $400,000. Hoaglund contacted Helen and indicated he wanted to talk to her about Glenn's proposal. Helen agreed. At the direction of her attorneys and unbeknownst to Hoaglund, Helen tape-recorded their two conversations on November 6, 1992.

In these conversations, Hoaglund relayed Glenn's offer to abide by the June 18 agreement and to give Helen an additional $400,000. Hoaglund also told Helen that Glenn was "threatening stuff that he was going to do" if the situation was not resolved. That "stuff" included having Helen indicted on a trumped-up burglary charge and filing "some contempt thing" apparently concerning their daughter. Hoaglund also told Helen that Glenn had indicated he was going to countersue Helen, and that he—Hoaglund—suspected that Glenn was going to sue Helen and her attorneys for tortiously interfering with his law practice. Hoaglund also told Helen that Glenn was a "crazy ... son of a bitch" who would "go to this [sic] death bed and not let anybody know where that million dollars in gold is.... He may go to the Cayman islands. He may go to Canada. The gold will never be found." Hoaglund told Helen she could not trust Glenn.

The tapes of the conversations were played to the jury. Glenn objected at trial, and argues on appeal, that the conversations were settlement negotiations and were therefore inadmissible.

The rules of evidence provide:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liabili-

ty for, or invalidity of, the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice or interest of a witness or a party, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

TEX.R. CIV. EVID. 408.

Glenn asserts Hoaglund's conversations with Helen were "proper settlement negotiations" and therefore inadmissible. Rule 408 does not require exclusion when the evidence is offered for a purpose other than to prove liability for, or invalidity of, a claim or its amount. Helen's seventh amended petition, the live pleading when the parties went to trial, contained a claim for intentional infliction of emotional distress based on these conversations and Glenn's alleged threats against her. Helen offered evidence of these conversations in support of her claim for intentional infliction of emotional distress; her counsel argued that Glenn's threats "caused her great anguish and concern. It is something that is very definitely part of the cause of action in this case." Glenn's only authority for his assertion that this evidence is inadmissible is his citation to rule 408, and his only argument is that it is inadmissible because the conversations constituted settlement negotiations. Glenn has not demonstrated that the evidence was inadmissible.

We overrule Glenn's point of error 2(D).

## 3. Prejudicial, Incurable Jury Argument

In point of error six, Glenn asserts the trial court erred in overruling his objections to "prejudicial and/or incurable comments and/or argument" regarding the absence of Glenn and witness Janet Brewer.[14]

Glenn objected to the following statement made in closing argument by Krist, Helen's counsel:

I am going to suggest something to you folks. I am going to suggest to you that Glenn Vickery didn't have the courage to face his wife about the true reasons that he wanted the divorce. And he doesn't have the courage to face this jury.

Glenn's counsel objected that Krist had violated his own motion in limine.[15] The trial court overruled the objection. Glenn asserts this statement is so highly prejudicial that it requires reversal.

To obtain reversal of a judgment on the basis of improper jury argument, an appellant must prove (1) an error, (2) that was not invited or provoked, (3) that was preserved by proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, (4) that was not curable by an instruction, by prompt withdrawal of the statement, or by a reprimand by the judge, and (5) the argument by its nature, degree, and extent, constituted reversibly harmful error. *Gorman v. Life Ins. Co. of N. Am.*, 859 S.W.2d 382, 388 (Tex.App.—Houston [1st Dist.] 1993, no writ). We must determine if the probability that the improper argument caused harm is greater than the probability that the verdict was based on proper proceedings and evidence. *Id.* at 388–89. The improper argument must be evaluated in light of the whole case, beginning with voir

14. Janet Brewer was Glenn's office manager. Under subpoena to appear at trial, Brewer sent a letter, accompanied by a doctor's statement, stating she was too sick to appear. Helen's counsel investigated and learned that Brewer was on a two-week trip to Europe.

15. Krist did not want the jury to know that Glenn was in the hospital or about the seriousness of his condition.

dire and ending with closing argument. *Id.* at 389.

In this case, the jury had been told Glenn was sick and unable to attend trial, but due to Krist's motion in limine, the jury had not been told Glenn was so ill that he had been hospitalized. Krist then violated his own motion in limine by arguing Glenn did not have the courage to face Helen in the courtroom. We hold the trial court erred by overruling Glenn's objection to Krist's argument.

Nevertheless, we conclude the error was harmless. We have reviewed the entire record. The complained-of statement was an isolated comment, in a lengthy closing argument. The evidence presented to the jury, much of which is detailed elsewhere in this opinion, fills 10 volumes. We believe there is very little probability that this comment, egregious though it was, could have affected the outcome of this case.

Glenn also complains of Krist's comments about Janet Brewer. After noting Brewer was absent from court in violation of the court's subpoena, Krist stated:

She is the woman that [sic] knows where the gold is.[16]

She is the woman that knows the true value of Glenn Vickery's estate.

. . . .

I think the least we can do is give Mrs. Vickery—Mrs. Helen Vickery— the benefit of the doubt on the assets that we've discovered, the 15.4 million. I feel that's why Janet Brewer is not here in order to avoid having to perjure her own self in violation of this Court's subpoena.

She was the one who kept the records of the gold. She was the, quote, busi-

ness manager. She hasn't shown to this day. Mr. Weinberg [Richards' counsel] is talking about learning things from what's not said as well as what is said. You can learn things about people who avoid—not only avoid subpoenas, but violate subpoenas.

Glenn's counsel did not object to these statements. To preserve error on curable argument, counsel must object and request an instruction to disregard. *Texas Employers Ins. Ass'n v. Puckett,* 822 S.W.2d 133, 135 (Tex.App.—Houston [1st Dist.] 1991, writ denied). Objection is not required in the case of incurable argument, which is defined as argument so inflammatory that its harmful or prejudicial nature cannot be cured by an instruction to disregard. *Id.* On appeal Glenn asserts the argument was so highly prejudicial that objection was unnecessary to preserve error. He asserts there was no evidence that Brewer knew where the gold was, and no evidence to support Krist's assertion that he believed Brewer violated the subpoena in order to avoid committing perjury.

We do not believe the argument was so inflammatory that its harmful or prejudicial nature could not have been cured by an instruction to disregard.

We overrule Glenn's point of error six.

### 4. The Bill of Review and Division of Property

In Glenn's points of error seven and eight, he complains the evidence is legally and factually insufficient to support the jury's finding that the division of the marital estate was the result of extrinsic fraud unmixed with any negligence on Helen's part. In points nine and 10, he asserts the trial court did not make a just and right

---

**16.** The gold to which Krist referred is approximately $1 million in gold coins that Glenn purchased from a local dealer. In deposition testimony, Brewer stated that the purchases were customarily delivered to her at Glenn's office, and that she would take the gold to Glenn's safe deposit box. The possession and location of the gold was disputed. In the recorded conversation between Hoaglund and Helen, Hoaglund made several references to the gold in Glenn's possession. In his deposition, Glenn stated that he thought Helen had taken the gold and given it to a relative.

division of property and abused its discretion in dividing the community estate. In point 11, he asserts the evidence was legally and factually insufficient to support the division of property. In point of error 12, he asserts the trial court erred in entering a judgment that awarded: damages in excess of a just and right division of property; prejudgment interest; damages for mental anguish; and punitive damages.

### A. The bill of review

A bill of review is a separate suit in equity, brought to set aside a judgment in the same court in an earlier suit, when the judgment in the earlier suit is final, not reviewable by appeal or by writ of error, and does not appear to be void on the face of the record. *Law v. Law*, 792 S.W.2d 150, 153 (Tex.App.—Houston [1st Dist.] 1990, writ denied). Courts do not look on bills of review with favor. *Id.* The grounds upon which petitions for bill of review are granted are narrow and restricted. *Montgomery v. Kennedy*, 669 S.W.2d 309, 312 (Tex.1984); *Bakali v. Bakali*, 830 S.W.2d 251, 255 (Tex.App.—Dallas 1992, no writ). To be entitled to a bill of review, the petitioner must allege and prove: (1) a meritorious defense to the earlier cause of action (2) that she was prevented from making by fraud, accident, or mistake of the opposite party (3) that is unmixed with any fault or negligence of her own. *Bakali*, 830 S.W.2d at 255; *Law*, 792 S.W.2d at 153. In relation to attacks on final judgments, fraud is classified as either extrinsic or intrinsic. *Montgomery*, 669 S.W.2d at 312. Only extrinsic fraud will entitle a petitioner to bill of review relief. *Id.* Extrinsic fraud denies a losing litigant the opportunity to fully litigate her rights or defenses upon trial. *Id.* It is conduct that prevents a real trial upon the issues involved. *Id.* at 313. It requires proof of some deception practiced by the adverse party, collateral to the issues in the case,

that prevents the petitioner from fully presenting her claim or defense in the underlying action. *Bakali*, 830 S.W.2d at 255; *see Montgomery*, 669 S.W.2d at 312. Intrinsic fraud is inherent in the matter considered and determined in the trial, where the fraudulent acts pertain to an issue involved in the original action, or where the acts constituting the fraud were or could have been litigated therein. *Id.* at 313. Intrinsic fraud includes false testimony, fraudulent instruments, and any matter actually presented to and considered by the court in rendering the judgment assailed. *Id.; Lawrence v. Lawrence*, 911 S.W.2d 443, 447 (Tex.App.—Texarkana 1995, writ denied).

Helen testified Glenn duped her into getting the divorce by persuading her that it was necessary to protect the family's assets [17] and that the couple would reunite after the malpractice suit threat had passed. Glenn hired Richards and had Richards file a petition in Helen's name and his answer and counterclaim. Although Helen knew a divorce petition would be filed, she did not know Glenn filed a counterclaim against her. Glenn asserts that his alleged misrepresentations—that the divorce was to protect assets and that they would reunite after the malpractice suit threat had passed—cannot as a matter of law rise to the level of extrinsic fraud. The essence of Helen's claim, however, is she was duped into not contesting the divorce because she believed it was to be a sham divorce—in other words, Glenn's misrepresentations prevented her "from fully presenting her claim or defense in the underlying action." The supreme court has held that a fiduciary's concealment of material facts, used to induce an agreed or uncontested judgment, that prevents a party from presenting his legal right at trial, constitutes extrinsic fraud. *Montgomery*, 669 S.W.2d at 313. Helen asserts Glenn concealed from

---

**17.** We note that while Glenn testified he sought the divorce because the marriage had deteriorated, Richards testified that the only reason Glenn gave for the divorce was for the protection of assets.

her his real reason for wanting a divorce, as well as the fact that June Wright offered to settle her malpractice suit for policy limits before Helen signed the divorce decree. We conclude the evidence is legally and factually sufficient to support a finding of extrinsic fraud.

Glenn further asserts Helen did not show she was without fault or negligence. He notes, among other things, that Helen was a legal assistant, claims she did not read the divorce decree before signing it, and admits she never called or wrote to Richards. Glenn further asserts any negligence of Richards is imputed to Helen; specifically, he asserts Richards was negligent in filing the divorce petition without speaking to Helen, not informing Helen of her legal rights, not filing an inventory, and not telling Helen when they were going to court.

Helen testified she relied on Glenn and her attorney, Richards. Glenn was not only Helen's husband; he was also an attorney. We cannot say Helen's reliance on these two attorneys, both of whom were fiduciaries with respect to Helen, was negligence. We also agree with Helen that Richards' acts should not be imputed to Helen. Richards filed the divorce petition and Glenn's answer and counterclaim at *Glenn's* direction. It would be inappropriate to reward Glenn for actions taken by Richards at his own behest.

### B. Alternate basis for judgment

The trial court's judgment provides in part that

> the Bill of Review is granted and the marital estate of the parties shall be divided as of November 22, 1991, on the following basis, which the Court alternatively adjudges is identical to the divi-

sion the Court alternatively makes of property to be undivided [sic] in the November 22, 1991 Decree of Divorce and the May 12, 1992 Nunc Pro Tunc Judgment in accordance with Article 3.91(a)[18] of the Family Code.

The order then divides the marital estate, awarding Helen 58 percent of the estate and awarding Glenn 42 percent. Helen notes that Glenn challenges only the bill of review, and not the alternative basis for judgment. Thus, she argues, Glenn's challenge to the bill of review is immaterial and the judgment must be affirmed on the basis of this independent ground.

If a judgment rests on more than one ground, the party aggrieved by the judgment "must assign error as to each such ground or risk having the judgment affirmed on the ground to which no error was assigned." *Texas Dep't of Human Resources v. Orr,* 730 S.W.2d 435, 436 (Tex.App.—Austin 1987, no writ). Here, the trial court divided the marital estate pursuant to granting the bill of review and alternatively as a division of property undivided by the divorce decree or judgment nunc pro tunc. We agree with Helen that because Glenn did not challenge the alternative reason given by the trial court for dividing the marital estate, Glenn's challenge to the finding on the bill of review is immaterial.

We overrule Glenn's points of error seven and eight.

### C. Division of property

In points nine and 10, Glenn asserts the trial court did not make a just and right division of property and abused its discretion in dividing the community estate. In point 11, he asserts the evidence was legally and factually insufficient to support the division of property.

18. Section 3.91(a) provides:
> If a final decree of divorce or annulment rendered by a Texas court failed to dispose of property subject to division under Section 3.63 of this code even though the court had jurisdiction over the spouses or over

> the property, the court shall divide the property in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage.

Tex. Fam.Code Ann. § 3.91(a) (Vernon 1993).

On June 3, 1994, the trial court signed two documents: a division of marital estate and an order dividing the marital estate.[19] The division of marital estate listed the assets of the estate and the values assigned to each asset. The order listed those assets awarded to each party, along with the dollar value of each, and provided that Helen received 58 percent of the marital estate and that Glenn received 42 percent. The final judgment listed the assets awarded to each party, and included a description of the property awarded. We will refer to these documents collectively as the 1994 judgment.

Glenn asserts the evidence is legally and factually insufficient to support the values assigned to the property in the 1994 judgment. Helen asserts that because Glenn has not challenged the trial court's alternative division of property found to be undivided by the divorce decree and nunc pro tunc judgment,[20] the 1994 judgment should be affirmed.

In points of error seven and eight, we declined to address Glenn's points of error relating to the legal and factual sufficiency of the evidence supporting the jury's finding that Glenn committed fraud because Glenn failed to challenge the alternative reason given by the trial court for dividing the marital estate. However, we believe that it is appropriate to address Glenn's points of error nine, 10, and 11, in which he complains that the trial court did not make a just and right division of the property. Even under TEX. FAM.CODE ANN. § 3.91 (Vernon 1993), which the trial court gave as its alternative basis for judgment, it must divide the marital property in a manner that is "just and right." Therefore, Glenn's points of error relating to whether the division was just and right are properly before the Court.

The original decree and nunc pro tunc decree awarded Helen the following:

The residence and contents of the house in West University;

Clothing, jewelry and personal effects in her possession or subject to her control;

Money in any account in Helen's name;

Any retirement benefits or other benefits existing by reason of Helen's employment;

Any stocks, bonds, or securities in Helen's name;

All life insurance policies in Helen's name; and

A 1955 Pontiac.

The decree and nunc pro tunc decree awarded Glenn the following:

The residence and contents of the house in Liberty County (Moss Hill);

Clothing, jewelry and personal effects in his possession or subject to his control;

Money in any account in Glenn's name;

Any retirement benefits or other benefits existing by reason of Glenn's employment;

Any stocks, bonds, or securities in Glenn's name;

All life insurance policies in Glenn's name; and

Glenn's law practice.

As previously noted, the divorce decree was deliberately vague with respect to many of the Vickerys' assets. Specifically not identified in the decree were, among other things, an annuity that paid approximately $35,000 a month (payable to Helen and Glenn), Pepsico stock, gold coins, treasury bills, a promissory note (the Rockwall note), and a collection of antique cars.

After the divorce, in addition to the items specified in the decree, Helen received $500,000 in treasury bills, the Pepsico stock, and a 1990 Suburban. Glenn

19. This order was discussed in the previous section on the bill of review; it granted the bill of review and alternatively provided that the trial court was dividing previously undivided assets.

20. The order provides the division of property pursuant to the bill of review and the division of property undivided in the original divorce are identical.

kept $1,000,000 in treasury bills. Until August 1992, Glenn gave Helen one-half of the monthly annuity check.

The award of assets in the 1994 judgment and the award of assets in the original divorce decree and nunc pro tunc decree are, in many respects, identical. The 1994 judgment, however, awarded some of the assets unspecified in the original divorce decree that had been divided by the parties after the divorce, and awarded previously unspecified and undivided assets. Helen again received the West University house and contents, personal effects, bank accounts, retirement benefits, the Pontiac, stocks, and life insurance. The 1994 judgment also awarded Helen those previously unspecified assets she had already received: the Suburban, the Pepsico stock, and the treasury bills. Additionally, the 1994 judgment awarded Helen the annuity. Under the 1994 judgment, Glenn again was awarded the Moss Hill property and contents, personal effects, bank accounts, retirement benefits, stocks, life insurance, and his law practice. The 1994 judgment also awarded those previously unspecified assets Glenn had already received: the antique cars (and other collectibles), and $1,000,000 in treasury bills. The 1994 judgment then awarded Glenn: all cases pending in his law office; the Rockwall note; annuity payments paid between December 1, 1991, and August 31, 1992; and "[a]ll gold of the parties which the Court finds exclusively in the custody and control of Glenn W. Vickery in the amount of $992,000.00."

Glenn argues, first, that the trial court "erred in awarding to Glenn his separate estate, Moss Hill Ranch, rather than confirming such as his separate property." [21] In his reply brief, Glenn argues that under this Court's decision in *McElwee v. McElwee*, 911 S.W.2d 182 (Tex.App.—Houston

[1st Dist.] 1995, writ denied), the trial court clearly abused its discretion.

In *McElwee*, the trial court mischaracterized community property as the wife's separate property. 911 S.W.2d at 189. We noted a trial court has broad discretion in making a "just and right" division of the community estate, and its decision will not be disturbed on appeal absent abuse of discretion. *Id.* We further noted an appellate court may not render a new division of property; only a trial court may make a division of community property. *Id.* at 189. With respect to mischaracterized property, we stated:

> If the trial court mischaracterizes community property as separate property, then the property does not get divided as part of the community estate. *If the mischaracterized property has value that would have affected the trial court's just and right division, then the mischaracterization is harmful and . requires the appellate court to remand the entire community estate to the trial court for a just and right division of the properly characterized community.* If, on the other hand, the mischaracterized property had only a *de minimis* effect on the trial court's just and right division, then the trial court's error is not an abuse of discretion.

*Id.* (first emphasis added). The trial court stated it had awarded the wife approximately 61 percent of the community estate. However, counting the mischaracterized property, the wife actually received approximately 64 percent of the community estate. *Id.* at 190. Had this Court not remanded the case to the trial court, we would have effectively awarded a new division of the community estate—64 percent to the wife, rather than 61 percent. We therefore reversed and remanded, holding:

> when a mischaracterization has more than a mere *de minimis* effect upon the trial court's division, the appellate court

21. We note that the divorce decree and nunc pro tunc judgment, prepared at Glenn's di- rection, also awarded him this property.

must remand the community estate to the trial court for a just and right division based upon the correct characterization of the property.

*Id.*

Helen responds that (1) Moss Hill was not mischaracterized, and (2) even if it was mischaracterized, the error was harmless. We will address each argument.

On June 3, 1994, the trial court signed a document entitled "DIVISION OF MARITAL PROPERTY." In this document, Moss Hill was valued as follows:

Moss Hill Ranch
| | | |
|---|---|---|
| 1) | House and 1 acre | $575,000.00 |
| 2) | Land—202 acres | $126,500.00 |
| 3) | Machinery, cattle, equipment & autos | $450,000.00 |

The total value assigned to Moss Hill was then included in the "NET COMMUNITY ASSETS."

On June 7, 1994, the trial court signed a final judgment, in which it divided the "parties' marital estate," in the same manner reflected in the June 3 order. Again, Moss Hill was included in the division and was awarded to Glenn. The Texas Supreme Court has held that the phrase "estate of the parties" refers only to community property. *Cameron v. Cameron,* 641 S.W.2d 210, 214 (Tex.1982).

These two documents show that, although the parties, including Helen, acknowledged that Moss Hill was Glenn's separate property, the trial court nonetheless mischaracterized it as community property.

Nevertheless, we believe that error in mischaracterizing Moss Hill was harmless. Helen's sworn inventory, which is evidence under *Vannerson v. Vannerson,* 857 S.W.2d 659, 671 (Tex.App.—Houston [1st Dist.] 1993, writ denied), showed that Glenn purchased Moss Hill before the marriage for $66,000. He paid $2,500 down; the remaining $63,500 was paid out of community funds. The evidence showed that $1,359,910 in community funds were subsequently expended on improvements to Moss Hill. Despite more

than 1.3 million dollars in improvements, the property was only valued at $701,500 at the time of the divorce in 1994.

Under the inception-of-title doctrine, Moss Hill is Glenn's separate property. *See Wierzchula v. Wierzchula,* 623 S.W.2d 730, 731 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ). The trial court could not divest Glenn of his separate property. *Eggemeyer v. Eggemeyer,* 554 S.W.2d 137 (Tex.1977). In fact, Glenn was awarded Moss Hill as his sole and separate property in the 1994 judgment.

However, even though Moss Hill is Glenn's separate property, the community estate has a reimbursement claim for any community funds used to discharge the purchase money obligation. *Rogers v. Rogers,* 754 S.W.2d 236, 240 (Tex.App.—Houston [1st Dist.] 1988, no writ). Therefore, the community was entitled to be reimbursed for the $63,500 that the community spent toward paying off the purchase money note.

The community also has a reimbursement claim for the enhanced valued of separate property, which is determined by the difference between the fair market value before and after any improvements made by the community during the marriage. *Anderson v. Gilliland,* 684 S.W.2d 673, 675 (Tex.1985); *Rogers,* 754 S.W.2d at 236. In this case, Moss Hill was valued at $66,000 (the purchase price) before any community funds were expended on it. Of this $66,000, the community was entitled to be reimbursed for $63,500, the balance it paid on the note. After the community spent over 1.3 million dollars on the property, its value had only increased to $701,500. In fact, the house, a community improvement, accounts for $575,000 of the $701,500. The trial court apparently concluded that most or all of Moss Hill's increased value was attributable to the more that 1.3 million dollars in improvements made by the community. Nevertheless, the community is not entitled to recover the total amounts it expended on Moss Hill; it may only recover the en-

hanced value. *Anderson*, 684 S.W.2d at 675.

Under the 1994 judgment, Glenn was not divested of his separate property. Instead, the property was awarded to him, along with a credit for the separate fund that he paid as a down payment on the property. By included the remaining value of Moss Hill in the property division, the trial court implicitly recognized the extent of the community investment in Moss Hill and effectively divided the community reimbursement claim between the parties. The trial court never put a specific value on the amount of the reimbursement claim, and Glenn does not contend that any such implied value of that claim was excessive. Even if the trial court determined that all of the increased value, to $701,500, was due to community expenditures, then giving Helen reimbursement for that amount would not be excessive, given the undisputed evidence that $1,423,410 in community funds was spent to purchase and improve Moss Hill ($63,500 purchase money + $1,359,910 improvements = $1,423,410).

Although the court mischaracterized Moss Hill as community property, we conclude, absent findings of fact and conclusions of law to the contrary, that such mischaracterization did not affect the trial court's division.

We overrule Glenn's points of error nine and 10.

In point of error 11, Glenn contends the evidence is legally and factually insufficient to support the trial court's division of property. In support of this point of error, Glenn argues (1) the trial court erred by considering Helen's sworn inventory as evidence of the value of the community property; (2) there is no evidence to support the valuation of Moss Hill Ranch as community property; (3) the evidence is legally and factually insufficient to support finding that the gold coins were in Glenn's possession; and (4) community liabilities were erroneously excluded from the valuation of the estate.

First, Glenn argues the trial court erred by considering Helen's sworn inventory as evidence and, absent such evidence, there is no evidence to support the values reached by the trial court in the property division. We disagree. In *Vannerson v. Vannerson*, 857 S.W.2d at 671, this Court held that when performing a division of marital property, the trial court could take judicial notice of a party's sworn inventory, which was filed and included in the papers before the trial court and referred to by the trial judge.

The record in this case shows Helen's inventory was filed on May 27, 1995, and the trial court referred to the inventory at the hearing on May 31, 1995. Therefore, the trial court properly considered Helen's inventory as evidence.

Second, Glenn argues there was no evidence to support the inclusion of Moss Hill Ranch in the valuation of the community estate, because Moss Hill Ranch is Glenn's separate property. We have already addressed this argument in response to Glenn's points of error nine and 10. Helen's sworn inventory was evidence that the community had contributed all but approximately $3000 toward the purchase price and improvement of Moss Hill. The value of Moss Hill, minus Glenn's $3000 initial payment, was properly considered by the trial court in dividing the property.

Third, Glenn argues the evidence is legally and factually insufficient to support the award to Glenn of "all gold of the parties which the Court finds exclusively in the custody and control of GLENN VICKERY, in the amount of $992,000." Glenn argues he was not in possession of the gold at the time of the property division. Glenn testified in his deposition that Helen had taken $800,000 to $900,000 in gold and such was either being held by Helen or her family. However, the bank's safety deposit records show no one other than Glenn and Janet Brewer had ever signed in to access the box where the gold was stored.

This evidence is legally and factually sufficient to show Glenn possessed the gold.

Finally, Glenn argues the trial court erred by excluding certain liabilities from the division of property. Specifically, Glenn contends the $3,821,371.89 in tort damages awarded to Helen should have been considered as a liability charged against the community. We cannot agree the tort damages assessed against Glenn should be a community liability. To so hold would be to make Helen responsible for half of the tort damages awarded to her because of Glenn's tortious conduct. Glenn has cited no authority to compel such a holding.

We overrule Glenn's point of error 11.

### D. Entry of judgment

In point of error 12, Glenn contends the trial court erred by entering a judgment beyond a just and right division of the property because it included (1) an award for mental anguish, (2) punitive damages, and (3) prejudgment interest on Helen's fraud and breach of fiduciary duty claim. Glenn argues that by electing to proceed on a bill of review, Helen is only entitled to a just and right division of the property and cannot recover any tort damages.

In this case, the jury found Glenn had committed fraud and breached his fiduciary duty toward Helen and awarded her $6,700,000 for loss of marital property and $1,300,000 for mental anguish. The jury also found Helen was entitled to a bill of review to set aside the prior division of property and the trial court made a new division of property. Helen elected to recover her share of the marital property and not to take her tort damages for loss of marital property, since those damages would effectively duplicate what she was getting under the trial court's just and right division. Glenn contends that by electing to recover her share of the marital property under the bill of review, she forfeited not only her damages for loss of marital property, but also all of her re-

maining tort damages, including the award for mental anguish. We will address each of the contested awards separately.

### 1. Mental anguish

Glenn argues the doctrine of election of remedies bars Helen's recovery of actual damages for mental anguish. He contends that by electing to recover her marital property under the bill of review, she forfeited her right to recover any of her tort damages, including mental anguish.

The election of remedies doctrine bars relief only when (1) one has made an informed choice (2) between two or more remedies, rights, or states of facts (3) which are so inconsistent as to (4) constitute manifest injustice. *Bocanegra v. Aetna Life Ins. Co.*, 605 S.W.2d 848, 851 (Tex. 1980) The purpose of the election of remedies doctrine is to prevent double recovery for a single wrong. *Green Oaks, Ltd. v. Cannan*, 749 S.W.2d 128, 131 (Tex.App.— San Antonio 1987), *writ denied per curiam*, 758 S.W.2d 753 (Tex.1988). A plaintiff is entitled to one satisfaction for sustained injuries. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex.1991). The "one satisfaction" rule applies to prevent a plaintiff from obtaining more than one recovery for the same injury. *Id.* If a jury verdict contains more than one acceptable measure of damages, a plaintiff may be forced to elect prior to judgment the recovery he wants by waiving the surplus jury findings on damages. *Kish v. Van Note*, 692 S.W.2d 463, 466–67 (Tex.1985).

In *Green Oaks, Ltd.*, 749 S.W.2d at 129–30, the plaintiff sought to void an illegal foreclosure and monetary damages caused as a result of the foreclosure. The plaintiff was successful in having the foreclosure declared void. *Id.* The defendant contended that by voiding the sale the plaintiff had elected his remedy and was precluded from seeking money damages. *Id.* at 131. The court held that no election of remedies was required because there was "no inconsistency between allowing a plaintiff to recover a title taken wrongfully

and for the damages suffered while the property was wrongfully held." *Id.*

In this case, there is no double recovery. Helen recovered her marital property under the bill of review. In doing so, she forfeited her right to recover the $6,700,000 jury award for the loss of her marital property.[22] Allowing Helen to recover her marital property is not inconsistent with allowing her to recover for mental anguish she suffered as a result of Glenn's actions. The judgment does not contain a duplicative award for actual damages. The trial court did not err by allowing Helen to recover for mental anguish.

### 2. Punitive damages

Second, Glenn argues Helen is not entitled to recover punitive damages because the judgment does not include any actual damages based upon fraud or breach of fiduciary duty. We disagree. Although Helen chose to recover her marital property in lieu of an award under her fraud claim for the loss of her marital property, she was also awarded mental anguish damages on her fraud claim. Mental anguish damages are actual damages. Thus, there was an award of actual damages upon which to base an award of punitive damages. The trial court did not err by awarding Helen exemplary damages on her fraud claim.

### 3. Prejudgment interest

The trial court awarded Helen $1,521,371.89 in prejudgment interest. This amount of prejudgment interest was calculated and awarded based on the $6,700,000 jury verdict for loss of marital property as a result of Glenn's fraud and breach of fiduciary duty. However, Helen chose not to receive the $6,700,000 for the loss of her marital property. Instead, she elected to recover her portion of the marital property after a new division of the property under the bill of review. Glenn argues that by choosing to recover her marital property rather than damages, Helen is precluded from seeking prejudgment interest.

The term "interest" encompasses two distinct forms of compensation; interest as interest and interest as damages. *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 551–52 (Tex.1985). Interest as interest is compensation allowed by law or fixed by the parties for the use or detention of money. *Id.* Interest as damages is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of the judgment. *Id.* It is the second of these categories that is present in this case.

In *Cavnar,* the supreme court discussed the rationale behind an award of prejudgment interest.

> The primary objective of awarding damages in civil actions has always been to compensate the injured plaintiff, rather than to punish the defendant. A law that denies recovery of prejudgment interest frustrates this goal. If a judgment provides plaintiffs only *the amount of damages* sustained at the time of the incident, plaintiffs are not fully compensated. They have been denied the opportunity to invest and *earn interest on the amount of damages* between the time of the occurrence and the time of judgment.

696 S.W.2d at 552 (emphasis added) (citations omitted).

Glenn argues that because Helen chose to redivide the property under the equitable bill of review she must forego the prejudgment interest, which was calculated based upon the money damages that she chose not to recover. Thus, the issue is whether Helen waived her right to recover prejudgment interest by choosing the equitable bill of review.

**22.** Helen concedes that a recovery of the marital property under the bill of review and damages for loss of marital property under the fraud claim would have been a double recovery. Therefore, she elected to recover the property under the bill of review.

While there are no cases involving prejudgment interest on this issue, there are several punitive damages cases that we find similar.

In *Consolidated Texas Financial v. Shearer*, 739 S.W.2d 477 (Tex.App.—Fort Worth 1987, writ ref'd), the homeowners sued the defendant for wrongful foreclosure. They sought alternate remedies: (1) a declaration that the trustee sale was null and void, or (2) damages for the fair market value of their equity interest in their home. *Id.* at 478. The jury found in favor of the homeowners and awarded them $36,288 in actual damages and $20,000 in punitive damages. *Id.* at 479. In lieu of the $36,288, the homeowners chose to accept the equitable relief of declaring the trustee sale null and void; however, they requested the court to also grant them the $20,000 in punitive damages. *Id.* The defendants argued that by electing equitable relief, the homeowners were prohibited from collecting the punitive damages, which were derived from the actual damage award. *Id.* The court held that even though the homeowners chose equitable relief, they could collect the punitive damages. *Id.* at 480. The purposes served by awarding punitives (punishing the defendants) would be served, and there was a finding of actual damages, even though the homeowners elected not to recover them. *Id., see also Nabours v. Longview Sav. & Loan Ass'n*, 700 S.W.2d 901, 905 (Tex. 1985) (exemplary damages available even though action involves equitable relief if there is also finding of actual damages); *Fillion v. Troy*, 656 S.W.2d 912, 915 (Tex. App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.) (punitive damages available when equitable relief granted).

We find these cases analogous to this situation. Prejudgment interest, like punitive damages, is derivative of actual damages. *Bayou Terrace Inv. Corp. v. Lyles*, 881 S.W.2d 810, 816 (Tex.App.—Houston [1st Dist.] 1994, no writ). We do not believe that Helen must forego her derivative damages merely because she elected to recover under the equitable cause of action as opposed to taking the actual damages. The record contains a finding of actual damages. Thus, the prejudgment interest was readily ascertainable. The purposes behind allowing prejudgment interest would be served by allowing Helen to recover it. She would not get a double recovery, but compensation for the loss of the use of her property.

Accordingly, we overrule Glenn's point of error 12.

### Points of Error Relating Solely to Richards

**1. Breach of Fiduciary Duty**

In her first point of error, Richards asserts the trial court erred in rendering a judgment on the finding she breached her fiduciary duty to Helen because there was no evidence or insufficient evidence to support a finding that: (1) [A and B] she failed to advise Helen of any material fact Helen did not know; or (2) [C and D] Helen had been damaged.

The jury answered "Yes" to the following question: "Did Dianne Richards breach her fiduciary duty to Helen Vickery while representing Helen Vickery in the divorce and marital property division between Helen Vickery and Glenn Vickery?" Jury question 6A asked:

> What sum of money, if any, . . . would fairly and reasonably compensate Helen Vickery for her damages, if any, that were proximately caused by Dianne Richards, if any, concerning the division of the marital property of Helen Vickery and Glenn Vickery?
>
> . . . .
>
> LOSS OF MARITAL PROPERTY:       *$100,000.00*
> MENTAL ANGUISH:       *$350,000.00*

The trial court rendered judgment that Helen take $350,000 from Richards.

**A. Standard of review, sufficiency of the evidence**

In reviewing the legal sufficiency of the evidence, we consider only the evidence

and inferences, when viewed in their most favorable light, that tend to support the finding, and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex. 1988). If there is any evidence of probative force to support the finding, the finding will be upheld. *See Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex. 1988). In reviewing the factual sufficiency of the evidence, we examine all the evidence, and will set aside a verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

### B. Breach of fiduciary duty

A fiduciary duty exists between attorney and client. *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex.1988); *Perez v. Kirk & Carrigan*, 822 S.W.2d 261, 265 (Tex.App.—Corpus Christi 1991, writ denied). The relationship between attorney and client requires absolute and perfect candor, openness and honesty, and the absence of any concealment or deception. *Perez*, 822 S.W.2d at 265.

It is uncontroverted Richards filed a petition for divorce in Helen's name without ever consulting Helen or obtaining her permission. It is also uncontroverted Richards prepared Glenn's answer and counterclaim, someone in her office signed it for Glenn, and her office filed this document; Richards never informed Helen that Glenn filed a counterclaim. Richards testified she never informed Helen of Helen's legal rights in a divorce. Helen testified she never spoke to Richards about the divorce until the day Glenn persuaded her to sign the divorce decree. According to Helen, she told Richards she did not want the divorce; Richards, however, told Helen that Helen was doing the right thing because she was protecting the family's assets by signing the decree. Richards testified she had discussed the divorce with

Helen and that Helen wanted the divorce. The jury believed Helen.

We conclude the evidence was legally and factually sufficient to support the jury's finding that Richards breached her fiduciary duty to Helen. We overrule Richards' point of error 1(A) and (B).

In points of error 1(C) and 1(D), Richards asserts there is no evidence or insufficient evidence that Helen was damaged. Richards asserts, to recover, Helen must show she has suffered a pecuniary loss. Even assuming this proposition is true, we hold there was sufficient evidence to demonstrate Helen had been damaged. Richards never filed an inventory or did any discovery regarding the extent of the marital estate. Richards testified herself that she intentionally drafted a divorce decree that was vague about the Vickerys' assets in order to conceal these assets from potential creditors. Helen and Glenn divided some of these undisclosed assets after the divorce. However, Helen presented evidence that Glenn had concealed $1 million in gold and $500,000 in treasury bills from her. Helen established she suffered a pecuniary loss by both legally and factually sufficient evidence.

We overrule Richards' point of error 1(C) and (D).

### 2. Evidence of the Fair Market Value of the Community Estate

In point of error two, Richards asserts the trial court erred in rendering judgment against her because there was no evidence or insufficient evidence "as to the fair market value of the whole or a substantial portion of the community estate without which appellee could not demonstrate she had been damaged." In point of error three, she asserts the trial court erred in admitting evidence the community estate had spent $1,400,000 for improvements to Moss Hill and evidence of the replacement cost Glenn placed on his furniture and personal effects after the divorce because this evidence was legally and factually insufficient to establish the

fair market value of the community estate. We assume these assertions relate to her argument that because Helen could not establish she suffered pecuniary loss, the trial court erred in entering judgment against Richards. For the reasons articulated in our discussion of point of error 1(C) and (D), we overrule Richards' points of error two and three.

### 3. Mental Anguish

In point of error five, Richards asserts the trial court erred in rendering a judgment for mental anguish damages because (1) as a matter of law, mental anguish is not recoverable for constructive fraud, and (2) the evidence was legally and factually insufficient to support a finding of mental anguish caused by Richards' alleged breach of fiduciary duty.

The following constitutes Richards' argument that mental anguish "is not a measure of damages or recoverable for constructive fraud":

> Recovery for mental anguish has not been allowed for cases of fraud in Texas, except in one case of fraudulent inducement, distinguishing the fact that fraudulent inducement is an intentional tort. The Supreme Court reemphasized that claimants can not [sic] recover for mental anguish in negligent misrepresentation and cannot be recovered [sic] under the Texas Deceptive Trade Practices Act absent proof of a willful or grossly negligent violation. The trend seems to be that the tort must have some scienter of the perpetrator. Fraud actions have generally been held to put the Plaintiffs [sic] back in the place where he was before the fraud occur [sic].

(Citations omitted.)

We understand Richards' argument to be: (1) breach of fiduciary duty constitutes constructive fraud, (2) one cannot recover mental anguish damages for fraud, and (3) the trial court therefore erred in awarding Helen mental anguish damages.

Fraud may be classified as actual or constructive. Actual fraud involves dishonesty of purpose or intent to deceive. *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex.1964). Constructive fraud is the breach of some legal or equitable duty that the law declares fraudulent because it tends to deceive others, violate confidences, or injure public interests. *Id.* The actor's intent is irrelevant. *Id.* Constructive fraud is most frequently found in a breach of a fiduciary or confidential relationship. 37 C.J.S. *Fraud* § 2(c)(2) (1943). In an action for fraud, damages are ordinarily limited to the actual loss that is a direct and proximate result of the fraud. *Hudson & Hudson Realtors v. Savage*, 545 S.W.2d 863, 868 (Tex.App.—Tyler 1977, no writ).

In *Boyles v. Kerr*, 855 S.W.2d 593 (Tex. 1993), the supreme court held that in Texas there is no general duty not to negligently inflict emotional distress. *Id.* at 594. The court noted, however, that "certain relationships may give rise to a duty which, if breached would support an emotional distress award." *Id.* at 600. As examples of such relationships, the court cited cases involving the failure of a telegraph company to timely deliver a death message and a funeral home's negligent mishandling of a corpse. *Id.*

In *Krishnan v. Sepulveda*, 916 S.W.2d 478, 482 (Tex.1995), the court found the physician-patient relationship is one that, if breached, would support an emotional distress award. *Id.* "Dr. Krishnan had a clear, legal duty to provide competent medical care to [her patient]. A breach of this duty, coupled with the mental anguish resulting from the loss of an unborn child, could provide a sufficient basis for [the patient's] recovery [of emotional distress damages]." *Id.*

We believe the attorney-client relationship is, like the doctor-patient relationship, a "special relationship" giving rise to a duty that, if breached, may support an emotional damage award. The attorney-client relationship has been held to be one

of *uberrima fides*—in other words, a relationship of the most abundant good faith, absolute and perfect candor or openness and honesty, and the absence of any concealment or deception, however slight. *State v. Baker*, 539 S.W.2d 367, 374 (Tex. Civ.App.—Austin 1976, writ ref'd n.r.e.).

Moreover, we conclude that the following factors support the existence of a "special relationship." First, there was a contractual relationship between Helen and Richards. Second, Helen, who testified she was coerced into getting a divorce she did not want, was particularly susceptible to emotional distress. Finally, Richards knew of Helen's susceptibility to emotional distress; Helen, according to her testimony, sobbed and told Richards on November 15, 1991 that she did not want the divorce.

We hold that, under the facts of this case, Richards' breach of fiduciary duty supports an award of mental anguish damages.[23]

To recover for mental anguish, the plaintiff must prove such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair, or public humiliation. *Havens v. Tomball Community Hosp.*, 793 S.W.2d 690, 692 (Tex. App.—Houston [1st Dist.] 1990, writ denied). Richards asserts there is no evidence she proximately caused the mental anguish suffered by Helen. We disagree. Helen testified that in the days after November 15, the date she signed the divorce decree and, according to her testimony, the first time she had spoken to Richards about the divorce, "I didn't eat. I didn't sleep. I cried all the time. I was very

emotionally disturbed. I think I was devastated. I was worried about my family." We hold the evidence was sufficient to show Richards proximately cause Helen mental anguish.

We overrule Richards' point of error five.

### 4. The Disciplinary Rules

In her point of error eight, Richards asserts the trial court erred by allowing counsel to question her concerning the Texas Disciplinary Rules of Professional Conduct (the disciplinary rules.) After Richards acknowledged the disciplinary rules were authoritative and relevant with respect to "how to deal with your client" and agreed the rules were the "ultimate authority in that area," Helen's counsel asked Richards a series of questions regarding her conduct in the original divorce case and the application of the disciplinary rules to that conduct. Defense counsels' objections to this line of questioning were overruled.

Helen's counsel similarly used the disciplinary rules as a basis for questioning both Helen's expert witness, Earle Lilly, and Richards' expert witness, former Texas Supreme Court Justice Eugene Cook, about Richards' conduct. Defense counsel objected to the use of the disciplinary rules during Lilly's testimony, but did not object to their use during cross-examination of former Justice Cook. On appeal, she complains only of the use of the rules during her testimony; she raises no argument about counsel's use of the rules in examining Lilly and cross-examining former Justice Cook.[24]

**23.** Helen has directed our attention to *Kneip v. Unitedbank–Victoria*, 734 S.W.2d 130 (Tex. App.—Corpus Christi 1987), *aff'd*, 774 S.W.2d 757 (1989). In *Kneip*, the court of appeals noted that the defendant bank conceded the "well-settled rule that mental anguish damages are recoverable for intentional torts," and held that a claim for fraud in the inducement, an intentional tort, would support a claim for mental anguish damages. *Id.* at 136. Here, there was evidence that Richards'

conduct was intentional; Helen testified that in their November 15, 1991, telephone conversation, Richards admitted to Helen that her conduct was unethical because she had not previously spoken to Helen. Under *Kniep*, Helen would be entitled to mental anguish damages.

**24.** We also note Richards' brief contains no citation to the portion of the record in which she was examined about the rules. *See* Tex. R.App. P. 38.1(h).

Richards argues on appeal: (1) the preamble to the disciplinary rules provides that the rules "are not to be used for any civil liability," and (2) case law states that a violation of a disciplinary rule does not give rise to a private cause of action.

Because Richards did not complain at trial about the use of the rules in former Justice Cook's cross-examination, and does not complain on appeal about the use of the disciplinary rules in questioning either former Justice Cook or Earle Lilly, we conclude that Richards has waived any complaint about the use of the rules during her direct examination.

We overrule Richards' point of error eight.

## 5. Trial Judge as Witness; Comment on the Weight of the Evidence

In Richards' point of error nine, she asserts she was entitled to a mistrial because the trial judge testified against her and made a comment on the weight of the evidence and because of a sidebar remark made by opposing counsel.

Helen asserted, among other things, that Richards was negligent in not filing an inventory of the estate in the divorce action. Helen called Richards as an adverse witness. During direct examination, Helen's counsel asked Richards about rule 6B of the Harris County Family Trial Division rules. Neither Richards nor Helen has provided this Court with the text of rule 6B, although Helen's counsel read the text of the rule into the record:

In all cases requiring the division of property and/or liabilities, the husband and wife each shall file with the Court or upon written mutual agreement exchange between themselves sworn inventories within 75 days of the date that suit is filed.

Both defendants' counsel objected that the rule did not apply to uncontested divorces, although, as read into the record, the rule does not provide it is inapplicable to un-

contested divorces. Glenn's counsel argued, "This Court knows that everybody does not file an inventory in every case that's filed in this building. That's just a given." The trial court overruled defendants' objections, stating:

That's not as I understand the rules of the Family Law Bar or as they are practiced [sic]. And to include all of the cases that are going to trial does not exclude inventories being filed. In fact even the statute says in regard to some sworn inventories [sic].

Helen's counsel asked Richards if she had filed an inventory and she responded she had not. The following exchange then occurred:

Mr. Krist: And you know that you were supposed to [file an inventory]?

Richards: Not in an uncontested matter, no, Sir, I don't.

Mr. Krist: All right. Then you disagree with Judge Elliott's ruling on the matter as having been something that's required in all cases.

Richards: Yes, sir.

Mr. Krist: Okay. Well, I will go along with the Judge's interpretation.

Both defendants' counsel objected to Krist's comment, and Richards' counsel moved for a mistrial, stating,

[A]t this point I believe counsel has injected the Judge as a witness in this case at this point by his questioning, indicating and asking the witness to disagree with His Honor.... And, unfortunately what it's done, we have had a comment on the weight of the evidence.

On appeal, Richards asserts that Rule 605 of the Texas Rules of Evidence "prohibits a trial judge to [sic] testify in a trial he is presiding over." Texas Rule of Civil Evidence 605 provides, "The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point."

Richards argues,

[P]art of the contested issue is whether or not there was a breach of the duty by

not filing an inventory. Rule 6B of the Family Trial Division relates to inventories. The Judge's comments were the Judge's interpretation of those rules. The Judge's comment was testimony and was an impermissible comment on the weight of the evidence.

We agree with Helen that the trial court's comment was elicited by defense counsel. Further, we do not consider the trial court's statement to be testimony.

A trial court comments on the weight of the evidence when it indicates an opinion as to the verity or accuracy of the facts in inquiry. *Aetna Cas. & Sur. Co. v. Martin Surgical Supply Co.*, 689 S.W.2d 263, 272 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). Even if the trial court's comment constituted a comment on the weight of the evidence, we again note that the comment was elicited by defense counsel; Glenn's counsel argued, *"This Court knows* that everybody does not file an inventory in every case that's filed . . . ." (emphasis added). Further, Helen's counsel questioned Helen's family law expert, Earle Lilly, about rule 6B. Lilly testified the rule "must be complied with" and can be disregarded only in rare instances in which the divorce is uncontested and the parties have little or no property. He further testified this was not the type of case in which the filing of an inventory should be waived. He testified the failure to file (or at least exchange) an inventory in this case fell "extremely beneath" the standard of care expected of an attorney. In light of this testimony, in addition to testimony discussed elsewhere in this opinion, we cannot say the sole comment by the trial court probably caused the rendition of an improper judgment. Tex.R.App. P. 44.1(a)(1).

We overrule Richards' point of error nine.

### 6. Motion to Quash

In point of error 11, Richards asserts the trial court erred in granting the motion filed by Robert Newey to quash and to limit production. In March 1992, Helen retained the law firm of Rosen & Newey. She met with Marian Rosen to determine whether the divorce decree protected her assets. Rosen apparently advised Helen that it did. In June 1992, Newey represented Helen in her post-divorce settlement negotiations with Glenn before this lawsuit was filed. In November 1993, Richards served Newey with a subpoena for a deposition; the subpoena specified that Newey was to produce the entire file pertaining to Helen. Newey filed a motion to quash, citing the attorney-client and work product privileges. In his motion, Newey stated he would tender the documents for *in camera* review, and Helen states in her brief he did tender the documents. The trial court granted the motion. On appeal, Richards asserts that Helen waived the attorney-client privilege by making "affirmative use thereof."

An offensive, rather than a defensive, use of a privilege occurs when a party seeks affirmative relief against another, yet attempts, on the basis of privilege, to deny the other party the benefit of evidence that would materially weaken or defeat the claims against the other party. *Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105, 107 (Tex.1985) (orig.proceeding). The supreme court has held such offensive use may constitute a waiver of privilege:

> "A plaintiff cannot use one hand to seek affirmative relief in court and with the other lower an iron curtain of silence against otherwise pertinent and proper questions which may have a bearing upon his right to maintain his action."

*Id.* at 108 (quoting *Pavlinko v. Yale–New Haven Hosp.*, 192 Conn. 138, 470 A.2d 246, 251 (1984)).

The *Ginsberg* offensive use waiver applies to the attorney-client privilege. *Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 163 (Tex.1993) (orig.proceeding). Richards asserts "information between attorney and client in the April/May meeting

could be outcome determinative with regard to [sic] if Helen Vickery still wanted the divorce in the Spring of 1992, or was unhappy with the division." [25]

Richards has not directed our attention to any portion of the record in which a copy of the trial court's order can be found. Neither has she provided this Court with a statement of facts from the hearing at which the trial court ruled that the documents were privileged. Finally, she has failed to supply this Court with copies of the documents that were tendered to the trial court by Newey for *in camera* review. Because of these deficiencies in the record, Richards has waived any complaint with respect to this point of error. Accordingly, we overrule Richards' point of error 11.

## Cumulative Error

The defendants assert the cumulative effect of the trial court's error amounts to reversible error. We have concluded there is no reversible error. Therefore, there is no cumulative effect. We overrule Glenn's point of error 13 and Richards' point of error 12.

## Conclusion

We affirm the judgment.

Justices COHEN and WILSON also participating.

Do not publish. TEX. R. APP. P. 47.

Chief Justice SCHNEIDER and Justices COHEN, MIRABAL, WILSON, HEDGES, TAFT, and NUCHIA voted against rehearing en banc. Justice O'CONNOR did not participate.

---

**25.** Richards also argues the information contained in the law firm's note regarding an alleged meeting with Helen in the fall of 1991 could be outcome-determinative in this lawsuit. She based her allegation of a meeting between Helen and Newey on Newey's deposition testimony, in which he indicated Helen first contacted his office in November 1991

Justice ANDELL dissented from the denial of rehearing en banc.

Judgment rendered and opinion delivered Dec. 1, 1997.

In The
Court of Appeals
For The
First District of Texas
NO. 01–94–01004–CV

GLENN VICKERY AND DIANNE RICHARDS, Appellants

V.

HELEN VICKERY, Appellee

On Appeal from the 311th District Court
Harris County, Texas
Trial Court Cause No. 91–42667

ERIC ANDELL, Justice, dissenting from denial of rehearing en banc.

I dissent from the majority's resolution of points of error four, five, and twelve.

In this case, the only special issues submitted to the jury concerned the division of the couple's marital property—*i.e.*, constructive fraud. Specifically, those issues were:

### QUESTION 1

Did Glenn Vickery breach his fiduciary duty to Helen Vickery concerning the division of the marital property of Helen Vickery and Glenn Vickery?

### QUESTION 2

Did Glenn Vickery commit fraud against Helen Vickery in the division of the marital property of Helen Vickery and Glenn Vickery?

---

regarding her pending divorce. In the deposition, Newey states he thinks Helen retained his firm in November 1991, but would have to check his records. The affidavit attached to Newey's motion to quash reflects, however, that Helen first visited the firm on March 17, 1992.

The jury answered "Yes" to both questions.[1]

The majority opinion correctly states that "[t]he case went to the jury on the issues of breach of fiduciary duty (against Glenn and Richards) and fraud (against Glenn)." Maj. Op. at 4. What the majority fails to acknowledge is that the only fraud claims against Glenn contained in the jury charge relate to his *constructive* fraud in the division of the couple's community property. No question regarding *actual* fraud was ever submitted to the jury.

In a single question regarding damages for both causes of action, the jury awarded Helen monetary damages based on Glenn's fraud and breach of fiduciary duty during the division of the couple's community property. In addition, the court granted Helen's bill of review and made a new division of the Vickerys' marital property.

In point of error five, Glenn complains, in part, that the questions regarding Glenn's fraud and breach of fiduciary duty—along with the damage question regarding those same causes of action—were improperly submitted to the jury. Glenn argues the submission provided Helen an additional remedy beyond that granted on her bill of review—namely, a redivision of the community estate. The basis of Glenn's complaint is that there is no independent cause of action for fraud or breach of fiduciary duty committed by one spouse against the other in the division of the parties' community property. He asserts that the proper remedy for any fraud or breach of fiduciary duty committed in the

division of the couple's community property is to take those actions into account during a redivision of the couple's community estate; the injured spouse is not entitled to receive a separate monetary award in addition to the redivision of property. I find Glenn's contention meritorious and would sustain his fifth point of error.

"Fraud on the community" is defined as "a wrong by one spouse which the court may consider in its division of the estate of the parties and which may justify an unequal division of the property." *Belz v. Belz*, 667 S.W.2d 240, 246 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). A trial court may enter a judgment regarding the damages suffered by one spouse as a result of the other spouse's fraud on the community. This type of recovery, however, is not awarded as separate damages for an independent cause of action. Rather, it provides the defrauded spouse a means of recouping the share of the community property lost as a result of the other spouse's fraud or breach of fiduciary duty. *See Mazique v. Mazique*, 742 S.W.2d 805, 808 (Tex.App.—Houston [1st Dist.] 1987, no writ); *Belz*, 667 S.W.2d at 247.

In *Belz*, the court wrote:

[A] claim of fraud on the community is a means to an end, either to recover specific property wrongfully conveyed, or ... to obtain a greater share of the community estate upon divorce, in order to compensate the wronged spouse for his or her lost interest in the community estate. In the context of a divorce and property division, fraud on the communi-

1. With respect to Helen's bill of review, question five of the charge asked the jury, "[w]as the division of the marital property between Helen Vickery and Glenn Vickery the result of extrinsic fraud by Glenn Vickery unmixed with any negligence on the part of Helen Vickery?" The jury answered, "Yes." Helen's bill of review having been granted, she was then entitled to a redivision of the couple's community property.

The language of question five does not indicate—and the majority opinion does not attempt to explain—what conduct by Glenn

supported this finding of extrinsic fraud. Extrinsic fraud is present where one spouse conceals material facts from the other spouse, and the defrauded spouse is thereby prevented from asserting some legal right. *See Montgomery v. Kennedy*, 669 S.W.2d 309, 313 (Tex. 1984). In this case, Glenn concealed from Helen the existence of approximately $1,000,-000 in gold coins which belonged to the community. Therefore, because she did not know that the coins existed, Helen was unable to assert any claim to them.

ty is a wrong by one spouse which the court may consider in its division of the estate of the parties and which may justify an unequal division of the property. Further ... the court may render a personal judgement against one spouse in order to effect an equitable division of the property and as a means to recoup for the defrauded spouse the value of the property lost from the estate, by reason of the wrongful acts of the other spouse. A judgement for fraud on the community, however, is not one which may stand alone in the absence of a property division pursuant to a termination of a marriage by divorce.

*Belz,* 667 S.W.2d at 246–47 (citations omitted).

Recently, the Austin Court of Appeals expressly refused to follow *Belz* and approved the recovery of punitive damages where one spouse asserts against the other a claim of fraud on the community. *Schlueter v. Schlueter,* 929 S.W.2d 94, 100 (Tex.App.—Austin 1996, n.w.h.). In *Schlueter,* the Austin court purported to rely on the "direct and unambiguous" language of the Texas Supreme Court in *Bounds v. Caudle,* 560 'S.W.2d 925 (Tex. 1977), *Price v. Price,* 732 S.W.2d 316, 319 (Tex.1987), and *Twyman v. Twyman,* 855 S.W.2d 619, 624 (Tex.1993). According to the *Schlueter* court, the Texas Supreme Court has abrogated the doctrine of interspousal immunity *for all purposes*—"allow[ing] a spouse to bring *any* cause of action against his or her spouse." *Schlueter,* 929 S.W.2d at 100. With all due respect to the Austin Court of Appeals, I think it interprets the holdings of *Bounds, Price* and *Twyman* too broadly. The language of those cases indicates that the Texas Supreme Court did not intend to paint with as broad a brush as the Austin court now wields.

Each of those cases involved one spouse's attempt to join in their divorce proceeding a claim to recover for personal injuries caused by the other spouse. *See*

*Bounds,* 560 S.W.2d at 926 (wrongful death); *Price,* 732 S.W.2d at 316 (negligence action to recover for personal injuries stemming from traffic accident); *Twyman,* 855 S.W.2d at 620 (intentional infliction of emotional distress). Awards for personal injuries are the separate property of the injured spouse. TEX. FAM. CODE ANN. § 5.01(a)(3) (Vernon 1993). Therefore, the cases cited in *Schlueter* do not address the situation where a spouse seeks to bring a tort claim for damage to the *community* in conjunction with the divorce proceeding.

Like *Belz* and *Mazique,* the case before us involves a tort committed by one spouse against the other with respect to the couple's *community* property. There is no allegation of injury to Helen's separate property. The questions submitted to the jury addressed Glenn's damage to community assets due to fraud and breach of fiduciary duty. *Bounds, Price, Twyman* and *Schlueter* are, therefore, inapplicable.

In fact, the supreme court's own language in *Price* and *Twyman* indicates that those holdings were limited to personal injury torts. In *Price,* the court stated:

The doctrine of interspousal immunity has previously been abrogated as to some causes of action in this jurisdiction. We now abolish that doctrine completely as to any cause of action. We do not limit our holding to suits involving vehicular accidents only.... To do so would be to negate meritorious claims such as was presented in *Stafford v. Stafford,* 726 S.W.2d 14 (Tex.1987). In that case a husband had transmitted a venereal disease to his wife, resulting in an infection that ultimately caused Mrs. Stafford the loss of her ovaries and fallopian tubes....

*Price,* 732 S.W.2d at 319 (citations omitted). Then, in *Twyman,* the supreme court further commented on the abrogation of interspousal immunity:

In *Bounds v. Caudle,* this court unanimously abolished the doctrine of interspousal immunity for intentional torts.

Ten years later, we abrogated interspousal immunity "completely as to any cause of action," including negligence actions for personal injuries. Under the rules established in *Caudle* and *Price, there appears to be no legal impediment to bringing a tort claim in a divorce action based on either negligence or an intentional act such as assault or battery.*

*Twyman,* 855 S.W.2d at 624 (citations and footnotes omitted) (emphasis added). By its own language, the supreme court implicitly recognized the distinction between damage to .the separate property of one spouse by the other, and damage to the couple's community estate during the division of the marital assets. A claim related to the former is unquestionably an independent cause of action under *Bounds, Price* and *Twyman;* a claim related to the latter is not.

I would hold that no independent cause of action for fraud or breach of fiduciary duty exists in this case. *See* Jimmy L. Verner, Jr., *Economic Torts and Double Recovery, in* ADVANCED FAMILY LAW COURSE 1995, at V–13 (State Bar of Tex. Prof'l Dev.1995) (noting that, where the community has been harmed, "the non-tortfeasor spouse cannot press an independent cause of action which would result in recovery exclusively by that spouse because the community estate, not the separate estate of the non-tortfeasor spouse, has been harmed"). Helen's bill of review was based on Glenn's conduct surrounding the division of the couple's community property. The trial court granted Helen's bill of review and ordered a new division of the community property. She should not have also been awarded monetary damages— much less prejudgment interest on those damages—for Glenn's actions. Depletion of the community's assets resulting from Glenn's fraud or breach of fiduciary duty should have been considered by the trial court when ordering the redivision of the community estate.

Because I would hold there is no independent cause of action in this case, I would also hold there is no basis to support the award of mental anguish damages against Glenn. *See In re Marriage of Moore,* 890 S.W.2d 821, 829–30 (Tex. App.—Amarillo 1994, no writ). I would, therefore, reverse the trial court's judgment against Glenn for $1,300,000 in mental anguish damages. In addition, because, without an award for mental anguish, there is no award of actual damages on which to base an award of punitive damages, I would likewise reverse the award of exemplary damages against Glenn in the amount of $1,000,000. *See Federal Express Corp. v. Dutschmann,* 846 S.W.2d 282, 284 (Tex.1993).

Thus, I would reverse the money judgement against Glenn for mental anguish, punitive damages, and prejudgment interest. The case should be remanded to the trial court for retrial and redivision of community property in accordance with this opinion—taking into consideration any depletion of the community assets resulting from Glenn's fraudulent conduct and breach of fiduciary duty toward Helen.

I also dissent from the majority's resolution of Richards' points of error 1(C) and 1(D). She contends that the evidence is insufficient to support the award of $100,-000 in actual damages to Helen because of Richards' fraud and breach of fiduciary duty. I agree. The majority's summary of the evidence reflects that Richards helped Glenn conceal from Helen $1,000,-000 in gold coins and $500,000 in treasury bills. However, after Helen's bill of review was granted, the trial court's redivision of the couple's community property indicates $992,000 in gold coins and $500,000 in treasury bills were among the community assets subject to redivision. Therefore, using the majority's own figures, it appears that Richards' conduct caused no more than $8,000 in actual damages to Helen. Because the evidence is insufficient to support the $100,000 award of actual damages

against Richards, I would also reverse that portion of the trial court's judgment.

For the reasons stated above, I respectfully dissent.

Do not publish. TEX.R.APP. P. 47.

Judgment rendered and opinion delivered Dec. 4, 1997.